235 N.J. Super. 139 (1988)
561 A.2d 680
ANN WALKO AND MICHAEL WALKO, PLAINTIFFS,
v.
KEAN COLLEGE OF NEW JERSEY, STUDENT ORGANIZATION OF KEAN COLLEGE OF NEW JERSEY, A CORPORATION OF THE STATE OF NEW JERSEY, COUNCIL FOR PART-TIME STUDENTS, A CORPORATION OF THE STATE OF NEW JERSEY, NANETTE STREHL, HEIDI ERRINGTON, LORI RAPUANO, MINA BOTASH, STEVE DOWLING, DAN KACHOOGIAN, GARY BLACK, TOM O'DONNELL, AND PATRICK IPPOLITO, DEFENDANTS.
Superior Court of New Jersey, Law Division Union County.
Decided July 8, 1988.
*142 Carol Lonergan Perez, (Palumbo & Renaud), Attorney for Plaintiffs.
Emerald Erickson, Deputy Attorney General, Attorney for Defendants Kean College of New Jersey and Patrick Ippolito.
John S. Fitzpatrick, Attorney for Defendant Student Organization of Kean College and Tom O'Donnell (Haggerty & Donohue).
Michael J. Lunga, Attorney for Defendant Student Organization of Kean College and Tom O'Donnell (punitive damages only) (Salerno & Lunga).
Kathleen Burns, (Sills, Beck, Cummis, Zuckerman, Radin, Tischman & Epstein), Attorney for Defendant Council for Part-Time Students, Inc. (punitive damages only).
*143 Robert W. McAndrew, Attorney for Defendant Council for Part-Time Students, Inc. (punitive damages only)
Michael T. Cooney, (Hueston, Hueston & Sheehan), Attorney for Defendant Gary Black.
William T. Marsden, (Jeffer, Hartman, Hopkinson, Vogel, Coomber & Peiffer), Attorney for Defendant Gary Black.
David E. Rehe, (Haskins, Hack, Piro, O'Day, Merklinger & Wallace), Attorney for Defendant Dan Kachoogian.
Marian B. Copeland, (Stevens & Gomperts), Attorney for Defendant Lori Rapuano.
David Scott Mack, (McGimpsey & Cafferty), Attorney for Defendant Nanette Strehl.
Janice L. Birnbaum, (Stryker, Tams & Dill), Attorney for Defendant Heidi Errington.
Harry B. Kotler, Attorney for Defendant Steve Dowling.
Mina Botas, Pro Se.
WECKER, J.S.C.

INTRODUCTION
Plaintiff's Complaint centers around a publication of the Kean College student newspaper, the Independent. More specifically, the claims arise out of a "spoof" edition, entitled the Incredible, which was published as pages seven to thirteen of the April 25, 1985 newspaper. The thirteenth page is composed entirely of phony "ads" including the one at issue:
*144 
There was at the time a genuine ad that regularly appeared in the Independent to publicize the student-run telephone "Hotline." That ad appeared at page 18 of the April 25, 1985 edition of the Independent:
*145 
The entire edition of the Incredible has been examined, and the context of the ad is a determinative factor in this court's ruling granting summary judgment to all defendants[1] on all counts. What is at stake here is the balance to be struck between the First Amendment's guarantee of freedom of the *146 press, and the individual's interest in reputation, peace of mind, and freedom from emotional distress. On these facts, freedom of the press outweighs the individual's interest.
The April 25, 1985 edition of the Independent included the following items related to the real "Hotline:"

 Page One Headline article regarding threatened
 loss of funding for full-time director.
 The Article continues on pages three
 and six.
 Page Four Headline Editorial regarding the Hotline
 loss of funding.
 Pages Four and Five Letters to the Editor regarding loss of
 funding.

DEFAMATION
A parody or spoof that no reasonable person would read as a factual statement, or as anything other than a joke  albeit a bad joke  cannot be actionable as a defamation. See, e.g., Pring v. Penthouse International, Ltd., 695 F.2d 438 (10th Cir.1982); but see Miss America Pageant, Inc. v. Penthouse International, Ltd., 524 F. Supp. 1280 (D.N.J. 1981) (same alleged parody article held not absolutely privileged). Even where a word is used that usually denotes criminal activity, it is constitutionally protected when no reasonable reader would perceive it as anything but "rhetorical hyperbole." Greenbelt Publishing Assn. v. Bresler, 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6 (1970) (plaintiff's activities were described as "blackmail" at a city council meeting.)
Here, the "announcement" appears under the title "Annoyances/Classicals" on the sixth page of a seven page spoof insert that contains not a single serious article. "This in itself would seem to provide a sufficient signal that the story could not be taken literally, and the portions charged as defamatory could not reasonably be understood as a statement of fact." Pring v. Penthouse International Ltd., 695 F.2d at 441.
*147 In Pring, defendant Penthouse had published an article about "Charlene," Miss Wyoming in a Miss America contest. The article was hardly a model of good taste. It described "Charlene's" talents as a baton twirler, including her ability to perform acts of fellatio with the baton. 695 F.2d at 440-441. Plaintiff, the "real" Miss Wyoming, apparently was not amused by the story and sued. The Tenth Circuit found that:
The First Amendment is not limited to ideas, statements or positions which are accepted; which are not outrageous; which are decent and popular; which are constructive or have some redeeming element; or which do not deviate from community standards and norms; or which are within prevailing religious or moral standards. Although a story may be repugnant in the extreme to an ordinary reader, ... the typical standards and doctrines under the First Amendment must nevertheless be applied. [Id. at 443.]
Cf. Hustler Magazine v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).
It is first for the Court to consider whether the publication is defamatory on its face, or is subject to both defamatory and non-defamatory meanings, or is not subject to any defamatory meaning. E.g., Romaine v. Kallinger, 109 N.J. 282, 290-92 (1988). Only if the Court finds both defamatory and non-defamatory interpretations is there a question of fact for the jury. Id.; Lawrence v. Bauer Publishing and Printing, Ltd., 89 N.J. 451, 459 (1982), cert. den., 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 395 (1982); Molnar v. Star-Ledger, 193 N.J. Super. 12, 17-18 (App.Div. 1984). The "Whoreline" ad that plaintiff complained of appeared surrounded by a page of obviously "fake" ads, in the middle of what was unquestionably a parody of the usual student newspaper. Plaintiff Ann Walko's name was listed along with three other well-known names on campus, male and female, one of whom was also a member of the college administration. No reasonable person, even glancing at the offending ad, could possibly conclude that it was a factual statement of plaintiff's availability for "good telephone sex."
In the context presented, the "announcement" is simply not a statement of fact. It is surrounded by other short, absurd announcements in a section which is clearly delineated as intended *148 humor. In short, no person could reasonably believe there is actually an entity entitled "Whoreline," featuring Janice Murray, Ann Walko, Steve Guttman and Matt Lynch. Accordingly, the plaintiff's claim for defamation must be dismissed as a matter of law.
Our case law has made it abundantly clear that a challenged publication must be viewed in context to determine whether or not it is subject to a defamatory meaning. See Karnell v. Campbell, 206 N.J. Super. 81, 89 (App.Div. 1985); Molnar v. Star-Ledger, 193 N.J. Super. at 18. Summary judgment is a particularly appropriate method for resolving such questions. E.g. Kotlikoff v. The Community News, 89 N.J. 62, 67 (1982). In addition to the immediate context of the other ads and the broader context of the seven-page parody section of the newspaper, the court notes the prior publication of articles and letters to the editor regarding controversial changes being proposed for the genuine telephone "Hotline." Given all of the surrounding circumstances, the Court is compelled to conclude that virtually everyone who read Ann Walko's name in the "Whoreline" ad would know that it was a joke ... not a very good joke, perhaps; downright vulgar and tasteless, most readers probably would conclude; but definitely not an assertion of fact that anyone would take seriously. See Pring v. Penthouse International, 695 F.2d 438, 443 (10th Cir.1982) ("... it is simply impossible to believe that a reader would not have understood that the charged portions were pure fantasy and nothing else.") Not being an assertion of fact, the ad must be treated as a protected expression of opinion. See id. It is thus absolutely privileged under the First and Fourteenth Amendments to the United States Constitution and under Article Six of the New Jersey Constitution.
The United States Supreme Court emphasized in the recent decision in Hustler Magazine v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) that it is not the value of the obviously vulgar ad itself, but rather the inherent danger in trying to set standards for value in a cartoon, satire, or parody, *149 that requires protection even for the most unthinkable publications.

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
A parody or spoof that is not actionable as defamation cannot as a matter of law form the basis of a recovery for intentional infliction of emotional distress, i.e., the tort of outrage. This has been unequivocally determined as a matter of constitutional law by the United States Supreme Court in its February 24, 1988 decision in Hustler Magazine v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).
The Supreme Court accepted the trial jury's verdict on the factual question, finding that the Hustler ad parody could not "`reasonably be understood as describing actual facts about (respondent) or actual events in which (he) participated.'" The Supreme Court went on to say
this claim [for the intentional infliction of emotional distress by "outrageous conduct"] cannot, consistently with the First Amendment, form a basis for the award of damages when the conduct in question is the publication of a caricature such as the ad parody involved here. [485 U.S. at ___ 108 S.Ct. at 883, 99 L.Ed.2d at 53.]
The Court's conclusion in the Hustler case compels absolute protection for the ad in the Incredible:
We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with `actual malice,' i.e., with knowledge that the statement was false or with reckless disregard as to whether or not it was true. This is not merely a `blind application' of the New York Times standard, see Time, Inc. v. Hill, 385 U.S. 374, 390 [87 S.Ct. 534, 543, 17 L.Ed.2d 456] (1967), it reflects our considered judgment that such a standard is necessary to give adequate `breathing space' to the freedoms protected by the First Amendment. [485 U.S. at ___, 108 S.Ct. at 882, 99 L.Ed.2d at 52-53.]
The Court stresses the importance of full First Amendment protection for political cartoons and satire, and the danger of trying to qualify the nature of the particular joke. Yet, the opinion of the Court somewhat inexplicably speaks in terms of *150 the New York Times v. Sullivan "actual malice" test.[2] The Court holds that a public figure like Jerry Falwell must prove actual malice (publication of a false statement of fact with knowledge of the falsity or with reckless disregard for the truth or falsity of the statement) in order to recover for intentional infliction of emotional distress.
The Court discusses Falwell's status as a public figure for First Amendment purposes. However, it is "the publication" of "a false statement of fact" that appears to be the determinative factor in the Court's holding. There was no statement of fact in the Hustler ad. By requiring "actual malice" for a public figure to recover damages for infliction of emotional distress, the Hustler Court is reiterating that pure opinion  which cannot be false and therefore cannot meet the New York Times v. Sullivan actual malice test  cannot support an intentional infliction of emotional distress claim, no matter how hurtful the opinion may be to a public figure. What the Supreme Court has not expressly said is whether the same rule applies to a private person who is the subject of an ugly parody.

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS  THE PRIVATE PLAINTIFF
In the Hustler cartoon as well as in the Incredible ad, no defamation occurred as a matter of law because there was no statement that any reasonable reader would have taken to be a factual assertion about the object of each parody.[3] The *151 Supreme Court held in Hustler that a public figure plaintiff must meet the same "actual malice" test on his intentional infliction of emotional distress claim as he would have to meet in a defamation claim. Would then a private figure plaintiff have to meet only a "negligence" test in an intentional infliction of emotional distress claim based on an allegedly false statement of fact  the same test such a plaintiff would face in proving a defamation claim?[4] How can a negligently published false statement support a finding of intentional infliction of emotional distress? Although the Supreme Court did not say so explicitly, it appears that after Hustler, even a private plaintiff must prove "actual malice" to recover for intentional infliction of emotional distress based on a defamatory publication.

PLAINTIFF AS A LIMITED PURPOSE PUBLIC FIGURE
The Supreme Court's holding in Hustler Magazine v. Falwell is explicitly applicable to a "public figure," which Jerry Falwell undoubtedly was. Two questions are naturally raised in this case. An affirmative answer to either one would be sufficient to decide the outcome. (1) Does Hustler mean that when a publication about a private person is held not to be defamatory as a matter of law because it involves no (false) statement of fact, then there can be no recovery for intentional infliction of emotional distress? (2) Was Ann Walko a "public figure" as to whom the parody ad is entitled to the same First Amendment protection as the offensive cartoon of Jerry Falwell?
*152 This Court believes both questions warrant affirmative answers. The first question is answered above. Although not essential to my holding, I will nevertheless discuss the second question.
Plaintiff Ann Walko was, at the time the parody ad was published, an Assistant to the Dean of the School of Education at Kean College and an Instructor there. She subsequently became the Executive Assistant to the Vice-President for Academic Affairs. The ad was published in a seven-page parody edition inserted into the college's student newspaper. That newspaper was circulated to the college community. Ann Walko had been active in college life and her name was known to many in the college community. She had previously submitted for publication in the student newspaper several pieces regarding her own activities on and off campus.
The parody ad listed four names  two students active in the real telephone "Hotline" and two college administrators within the Kean College community where the student newspaper was circulated. Ann Walko is properly considered a "public figure" within the college community. While there has been no New Jersey case expressly holding a teacher to be a public figure in the context of a general circulation newspaper's publication, this is a more limited finding.
The concept of a limited-purpose public figure has developed in both federal and state law. E.g. Gertz v. Welch, 418 U.S. 323, 351, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974); Lawrence v. Bauer Publishing and Printing, Ltd., 89 N.J. at 451; Barasch v. Soho Weekly News, Inc., 208 N.J. Super. 163, 170-76 (App.Div. 1986). The "limited" purpose has generally related to a particular issue, thus defining the person as a public figure only when the publication in controversy concerns that issue. E.g. Gomez v. Murdoch, 193 N.J. Super. 595, 599-600 (App.Div. 1984) (jockey is a public figure when publication relates to his professional performance). A key element, where public figure status has been so conferred on a plaintiff, is the *153 plaintiff's own access to the media. See e.g., Sisler v. Gannett Co., Inc., 104 N.J. 256, 265 (1986); Lawrence v. Bauer Publishing and Printing, Ltd., 89 N.J. at 464; Vassallo v. Bell, 221 N.J. Super. 347, 368 (App.Div. 1987). The same concept logically applies to a particular community  whether it be a geographical, institutional, or interest-group community. See, e.g., Basarich v. Rodeghero, 24 Ill. App.3d 889, 321 N.E.2d 739 (App.Ct. 1974) (community high school teachers and coaches were public figures within the community). See also Byers v. Southeastern Newspapers Corp., Inc., 161 Ga. App. 717, 288 S.E.2d 698 (Ct.App. 1982) (college dean is a limited-purpose public figure with respect to controversy over elimination of that position); Johnson v. Board of Junior College District # 508, 31 Ill. App.3d 270, 334 N.E.2d 442, 447 and n. 1 (App.Ct. 1975) (plaintiff college teachers "clearly had become public figures within the Wilson College Community, which was the community served by the publication.") It is noted that in the last two cited out-of-state cases, the plaintiffs had become publicly vocal on the particular controversy that was the subject of the publication.
Two key themes  the plaintiff's status in the community and the nature of the issue or controversy  and the interaction between them "reflect changing relationships between the policies of encouraging free speech and fairness to the individual." Sisler v. Gannett Co., Inc., 104 N.J. at 267. That the Kean College "Hotline" which is parodied in the offending ad was the subject of a then current controversy, along with plaintiff Ann Walko's status as an instructor and administrator at Kean College, support a finding that she is a limited-purpose public figure for purposes of applying the Hustler decision to this case.

NEGLIGENT SUPERVISION
Where this Court has found that the publication complained of is not defamatory as a matter of law, the claims (set *154 forth in the Second and Third Counts of plaintiff's Amended Complaint) that certain defendants "negligently supervised" the student newspaper "by allowing the publication of a ... libel" must also fail. If there is no defamation, then by definition there is no libel, irrespective of the nature of the supervision. It is therefore unnecessary for purposes of this decision to set forth the parameters of the duty (if any) owing by defendants O'Donnell, Ippolito, Kean, Student Organization, or Council to plaintiff or others, in relation to the content of the student newspaper.[5] Even a clear breach of duty permits no recovery if the breach does not proximately cause a legally cognizable harm. See, e.g., Polyard v. Terry, 160 N.J. Super. 497, 512 (App.Div. 1978). Thus summary judgment must be granted to these five defendants on the Second and Third Counts respectively.

FALSE LIGHT/INVASION OF PRIVACY
Plaintiff Ann Walko's remaining claims, set forth against all defendants in the Fourth and Fifth Counts, allege that plaintiff was placed in a "false light" and that the publication "invaded plaintiff's right to privacy." The question before this court is whether a false light/invasion of privacy claim is viable where it is based upon the very publication that the court has previously held non-defamatory and absolutely privileged as a First Amendment expression. In other words, does the *155 holding in Hustler Magazine v. Falwell, supra, with respect to an intentional infliction of emotional distress claim extend to a false light/invasion of privacy claim? This court holds that it does. As a matter of law plaintiff therefore cannot prevail on the Fourth or Fifth Counts, and summary judgment is granted to all defendants on those counts as well.
False light/invasion of privacy, as defined in the Restatement (Second) of Torts § 652E, is recognized as a tort in New Jersey law. See Romaine v. Kallinger, 109 N.J. at 293. In that case, our Supreme Court described the
differing interests protected by the law of defamation and the law of privacy, which account for the substantive gradations between these torts. The interest protected by the duty not to place another in a false light is that of the individual's peace of mind ... [whereas] .... "the action for defamation," on the other hand, "is to protect a person's interest in a good reputation...." [citations omitted]. Nevertheless, despite analytical distinctions, there is a conceptual affinity between the causes of action based on these two theories. [id. at 294, citing Cibenko v. Worth Publishers, Inc., infra.]
This Court assumes plaintiff's implied allegation that the "Whoreline" ad would be "`highly offensive to a reasonable person,'" as required by the Romaine definition. However, another requirement is that the statement "constitute a `major misrepresentation of [plaintiff's] character, history, activities, or beliefs'.... As with defamation claims, it is for the court first to determine whether the criticized matter is capable of the meaning assigned to it by plaintiff...." Id. at 295. Where the court has already determined that no reasonable reader would interpret the ad, in the context of the entire page of ads within the several pages of the "Incredible" spoof, as a factual claim about the plaintiff's availability for "good telephone sex," the "false light" cause of action must also fail. Like an alleged defamatory statement, the offending material must be examined in context to evaluate a "false light" claim. Id.
The Supreme Court's opinion and decision in Hustler must logically stand for the proposition that a publication which no reasonable person could interpret as an allegation of fact, is the equivalent of an expression of opinion that is fully privileged *156 under the First Amendment. Behavior that is so constitutionally privileged cannot be grounds for a damage award under any other theory, or the constitutional shield would be pierced by numerous lesser torts. The result must therefore be the same with respect to plaintiff's Fourth and Fifth counts[6] for false light/invasion of privacy. See Cibenko v. Worth Publishers, Inc., 510 F. Supp. 761, 766-67 (D.N.J. 1981):
An action for defamation and a claim for false light invasion of privacy, however, are closely allied, and the same considerations apply to each.... [t]he picture and caption are not reasonably capable of conveying the offensive meaning or the innuendo ascribed by plaintiff as the basis for his invasion of privacy claim. Additionally, for the same reasons that the picture and caption constitute opinion, and thus may not predicate a defamation action, no false light invasion of privacy action may lie."
Subsequent to this decision but prior to its publication, the Third Circuit adopted a similar rationale to preclude a claim for tortious interference with business. See Nanavati v. Burdette Tomlin Memorial Hospital, 857 F.2d 96, 109 (3d Cir.1988) (applying New Jersey tort law):
... the constitutional guarantees protecting speech against libel claims retain their full force regardless of the nature of the cause of action. Hustler Magazine v. Falwell, 485 U.S. [46], 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).
Because the malicious interference count in Nanavati was based on the same facts as a defamation count that the trial court had rejected, a jury verdict on the interference claim was reversed:
Any other result would impermissibly allow Sorenson to circumvent the statute of limitations and, more importantly the constitutional protections for defamation. [Id. at 110].

CONSORTIUM
A claim for consortium, such as Plaintiff Michael Walko sets forth in the Sixth Count, is entirely derivative from the claims of his wife, plaintiff Ann Walko. Tichenor v. Santillo, *157 218 N.J. Super. 165, 173 (App.Div. 1987). Having granted summary judgment in favor of all defendants on the First through Fifth Counts of the Amended Complaint, summary judgment must also be granted in favor of defendants on the Sixth Count.
NOTES
[1] Summary judgment motions were filed on behalf of defendants Kean College of New Jersey ("Kean"), Student Organization of Kean College of New Jersey, Inc. ("Student Organization"), Council for Part-Time Students, Inc. ("Council"), Kean administrator Patrick Ippolito ("Ippolito"), Student Organization employee and newspaper advisor Tom O'Donnell ("O'Donnell"), and most but not all of the seven student defendants who edited or managed the student newspaper. Because the court's decision turns on broadly applicable factual and legal rulings, the court in its discretion raises and decides the same motion as to all defendants.

All discovery in this case was completed prior to the summary judgment motions. The facts relied on by the Court are those that are either explicitly represented by all parties, or contained in unopposed certifications and affidavits. See Gomez v. Murdoch, 193 N.J. Super. 595, 602 (App.Div. 1984).
[2] As I see it, the decision in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), has little to do with this case, for here the jury found that the ad contained no assertion of fact. But I agree with the Court that the judgment below, which penalized the publication of the parody, cannot be squared with the First Amendment. [Hustler Magazine, Inc. v. Falwell, 485 U.S. at ___, 108 S.Ct. at 883, 99 L.Ed.2d at 53 (Justice White concurring).]
[3] A hypothetical defamation claim might fail where a false statement of fact was published, but was not reasonably subject to a defamatory meaning. In that case, the "actual malice" test might be met under an intentional infliction of emotional distress claim arising out of the same publication.
[4] The New York Times "actual malice" requirement goes to the mental state of the writer/publisher with respect to truth or falsity of the publication itself, and not with respect to the effect upon the object of the publication. Similarly the "negligence" test applies to the care given to the published remarks, and not to their effect upon the (eventual) plaintiff.
[5] These defendants variously raised in their briefs substantial constitutional questions with regard to the First Amendment protections applicable to a college student publication. They argue that there is a presumption of unconstitutionality in any prior restraint (by an arm of the state) against a publication. Thus the institutional defendants and their employees, also defendants, argue that they cannot be liable for negligence in failing to "censor" that which is constitutionally protected. That argument begs the question, which is whether indeed the publication here is constitutionally protected. Having determined that it is, there is no need in this case to consider the key question of the applicability of Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (high school student newspaper not entitled to full First Amendment protection) to a state college's student paper.
[6] Both counts allege virtually the same acts and harms, and the legal and factual basis for the two are virtually indistinguishable, despite some differences in verbiage.