**NEW TIMES, INC. d/b/a Dallas Observer, Dallas Observer, L.P., Rose Farley, Julie Lyons, and Patrick Williams, Petitioners,**

v.

**Bruce ISAACKS and Darlene A. Whitten, Respondents.**

No. 03–0019.

Supreme Court of Texas.

Argued Dec. 3, 2003.

Decided Sept. 3, 2004.

Rehearing Denied Nov. 5, 2004.

---

**74.** 936 S.W.2d 317, 323–24 (Tex.App.-Houston [1st Dist.] 1996, writ denied).

**75.** *Id.* at 324.

**76.** *Id.*

**77.** 534 S.W.2d 428, 431 (Tex.App.-Ft. Worth 1976, no writ).

**78.** Tex. Ins. Code § 5.06–3(c).

**79.** *Id.*

Steven P. Suskin, Law Office of Steven P. Suskin, Phoenix, AZ, R. James George Jr., James Alan Hemphill, George & Donaldson, L.L.P., Peter D. Kennedy, Graves, Dougherty, Hearon & Moody, P.C., Austin, for Petitioner.

James Scott Reib, Law Group of Rocky Haire and Scott Reib, and Michael J. Whitten, The Whitten Law Firm, Mike Griffin and Michelle Jones, Griffin, Whitten, Jones & Reib, Denton, TX, for Respondent.

Gregory S. Coleman, Weil Gotshal & Manges LLP, Austin, TX, for Amicus Curiae Association of American Publishers, Inc.

Justice JEFFERSON delivered the opinion of the Court.

This is a libel suit brought by a judge and a district attorney against a newspaper and its staff for publishing a satirical article the respondents contend was defamatory. The trial court denied the petitioners' motions for summary judgment, and the court of appeals affirmed. 91 S.W.3d 844. We reverse the court of appeals' judgment and render judgment that plaintiffs take nothing.

# I

## Factual Background

In November 1999, thirteen-year-old Christopher Beamon, a Ponder, Texas seventh grader, was arrested and detained for five days in a juvenile detention facility after the Halloween story he wrote as a school assignment was deemed to contain "terroristic threats." According to Beamon, his teacher assigned students the task of writing a scary story about being home alone in the dark and hearing noises.

Beamon penned a tale that described shooting a teacher and two classmates. He received a grade of 100, plus extra credit for reading it aloud in class. The school principal read the story and called juvenile authorities, who sent sheriff's deputies to remove Christopher from school. Denton County Juvenile Court Judge Darlene Whitten ordered Christopher detained at the Denton County Juvenile Detention Facility for ten days. She later approved an early release after five days, and Denton County District Attorney Bruce Isaacks declined to prosecute the case. He commented, "It looks like to me the child was doing what the teacher told him to do, which was to write a scary story. But this child does appear to be a persistent discipline problem for this school, and the administrators there were legitimately concerned." Brenda Rodriguez & Annette Reynolds, *Boy Freed After Story Lands Him in Cell; Ponder Seventh–Grader Wrote of Shooting Teacher, Students When Told to Pen Horror Tale*, Dallas Morning News, Nov. 3, 1999, at 1A.

The widely-reported Beamon incident received national and international attention. *See, e.g., id.;* John Kass, *Fear of School Violence Getting Best of Common Sense*, Chicago Tribune, Nov. 4, 1999, at 3; Josh Romonek, *Scary Halloween Essay Puts Student, 13, in Jail*, Chattanooga Times/Chattanooga Free Press, Nov. 4, 1999, at A2; Vin Suprynowicz, *So Simple, Even a Child Could Figure it Out*, Las Vegas Review Journal, Nov. 7, 1999, at 2D; Greg Torode, *Boy Jailed 6 Days for Essay on Massacre*, South China Morning Post, Nov. 4, 1999, at 1.

The *Dallas Observer*, a self-described "alternative newsweekl[y]" that focuses on reporting "in context and with perspective and sometimes with an individual's voice," published a satirical article lampooning the officials involved in the Beamon incident. The satire, written by Observer staff writer Rose Farley, ran in the *Observer's* November 11, 1999 print and online editions.[1]

Entitled "Stop the madness," the fictitious article described the arrest and detention of "diminutive 6 year-old" Cindy Bradley, who was purportedly jailed for writing a book report about "cannibalism, fanaticism, and disorderly conduct" in Maurice Sendak's classic children's book, *Where the Wild Things Are.*[2] Adjacent to the article was a picture of a smiling child holding a stuffed animal and bearing the caption, "Do they make handcuffs this small? Be afraid of this little girl." The article states that Bradley was arrested "without incident during 'story time'" at Ponder Elementary School and attributes fabricated words and conduct to Judge Darlene Whitten, District Attorney Bruce Issacks, and others.

Other false quotes and bogus factual assertions were strewn throughout the piece. Judge Whitten was said to have ordered Bradley detained for ten days at the Denton County Juvenile Detention Center while prosecutors contemplated whether to file charges. Whitten purportedly said: "Any implication of violence in a school situation, even if it was just contained in a first grader's book report, is reason enough for panic and overreaction. . . . It's time for you to grow up, young lady, and it's time for us to stop treating kids like children." Cindy was placed in ankle shackles "after [authorities] reviewed her disciplinary record, which included reprimands for spraying a boy with pineapple juice and sitting on her feet." The article noted that Isaacks had

---

1. The article and accompanying photograph are attached as an Appendix to this opinion.

2. Maurice Sendak, Where The Wild Things Are (Harper Collins 1963).

not yet decided whether to prosecute Cindy and quoted him as saying, "We've considered having her certified to stand trial as an adult, but even in Texas there are some limits." Yet another fictional quote was attributed to Dr. Bruce Welch, the Ponder ISD Superintendent: "Frankly, these kids scare the crap out of me." The article claimed that school representatives would soon join several local faith-based organizations, including "the God Fearing Opponents of Freedom (GOOF)," in asking publishers to review content guidelines for children's books.

In describing Sendak's 1964 Caldecott Medal winning book, the article offered the only true quote in the entire piece:

The most controversial aspect of the book is contained in an early exchange between Max and his mother. It reads:

*His mother called him 'WILD THING!'*

*and Max said 'I'LL EAT YOU UP!'*

*so he was sent to bed without eating anything.*

The article asserts that although he had not read the book, then-governor George W. Bush purportedly "was appalled that such material could find its way into the hands of a Texas schoolchild. This book clearly has deviant, violent sexual overtones. Parents must understand that zero tolerance means just that. We won't tolerate anything." The article concludes with Cindy "scoff[ing] at the suggestion that *Where the Wild Things Are* can corrupt young minds. 'Like, I'm *sure*,' she said. 'It's bad enough people think like Salinger and Twain are dangerous, but Sendak? Give me a break, for Christ's sake. Excuse my French.'"

Isaacks and Whitten demanded an apology, requested a retraction, and threatened to sue. In response, the *Buzz* column in the *Observer's* next edition (published November 18, 1999, one week after "Stop the madness") explained that the piece was a satire:

Buzz hates being one of those guys—commonly known as "losers" or "dateless"—who laboriously explains jokes. Unfortunately, some people—commonly known as "clueless" or "Judge Darlene Whitten"—did not get, or did not appreciate, the joke behind the news story "Stop the madness," which appeared in last week's *Dallas Observer.*

. . . .

Here's a clue for our cerebrally challenged readers who thought the story was real: It wasn't. It was a joke. We made it up. Not even Judge Whitten, we hope, would throw a 6–year–old girl in the slammer for writing a book report. Not yet, anyway.

Patrick Williams, *Buzz,* DALLAS OBSERVER, November 18–24, 1999, at 9.

## II

## Procedural Background

Isaacks and Whitten filed suit, claiming they were libeled by the "Stop the madness" article.[3] Isaacks and Whitten named as defendants New Times, Inc. (partial owner of the *Dallas Observer*), Dallas Observer, L.P. (publisher of the *Dallas Observer*), and Rose Farley, Julie Lyons, and Patrick Williams (the *Observer's* staff writer, editor-in-chief, and managing editor, respectively) (collectively, "New Times"). New Times moved for summary judgment, contending that, as a

---

**3.** Neither President Bush nor Dr. Welch sued the *Dallas Observer.* Dr. Welch did remark that, although he "like[s] satire like the best of them, [i]t's not as much fun when you [bear]

the brunt of it." Angela Ward, *Denton Judge, DA Plan Libel Suit,* TEXAS LAWYER, November 22, 1999, at 1.

matter of law: (1) an average or reasonable reader would understand the article at issue as a satire or parody rather than actual statements of fact about the plaintiffs; and (2) New Times negated actual malice. On December 30, 2000, the trial court denied New Times's motion on the first point, holding that there was a fact question as to how the reasonable reader would understand the article. On the actual malice issue, the trial court held that "to establish actual malice, the Plaintiffs must prove that the Defendants intended the reasonable reader to interpret as actual, literal statements of fact those portions of the November 11, 1999 article that Defendants contend are parody or satire, taking into account the article as a whole." The court then denied summary judgment on the actual malice issue, finding that the , plaintiffs required additional discovery.

New Times filed an interlocutory appeal, pursuant to section 51.014(b), Texas Civil Practice and Remedies Code. That appeal was stayed pending further summary judgment proceedings in the trial court. New Times filed its second motion for summary judgment on February 15, 2001, which was denied by order dated May 29, 2001. New Times filed a second notice of appeal, and the two appeals were consolidated.

In what New Times contends is "the first [decision] in the nation finding a triable fact issue in a libel case brought by elected public officials over a political satire," the court of appeals affirmed, holding that fact issues precluded summary judgment. 91 S.W.3d 844, 864. The court held that "satire or parody that conveys a substantially false and defamatory impression is not protected under the First Amendment as mere opinion or rhetorical hyperbole, but instead is subject to scrutiny as to whether it makes a statement of fact under defamation case law." *Id.* at 856.

The court concluded that "[a]fter examining the evidence in the light most favorable to the non-movants, we hold there is evidence raising a genuine issue of material fact that the 'Stop the madness' article fails to provide any notice to a reasonable reader that it was a satire or parody and that a reasonable reader could conclude that the article made statements of fact." *Id.* at 859. On the actual malice issue, the court of appeals applied "the traditional test for actual malice, as articulated in *Turner* [*v. KTRK Television, Inc.,* 38 S.W.3d 103 (Tex.2000) ]," and held that "there [was] evidence that the *Dallas Observer* knew or strongly suspected that when they published the article it was false and defamatory." *Id.* at 864. The court ordered New Times to pay attorney's fees and costs of the appeal and remanded to the trial court for a determination of those amounts. *Id.; see* TEX. CIV. PRAC. & REM. CODE § 51.015.

We granted the petition for review to address the important constitutional issues raised by defamation claims involving satire. 46 Tex. Sup.Ct. J. 1204 (Sept. 25, 2003).

### III

### Satire

■ New Times asserts that its statements are protected under the First Amendment to the United States Constitution and Article I, Section 8 of the Texas Constitution. "Where, as here, the parties have not argued that differences in state and federal constitutional guarantees are material to the case, and none is apparent, we limit our analysis to the First Amendment and simply assume that its concerns are congruent with those of article I, section 8." *Bentley v. Bunton,* 94 S.W.3d 561, 579 (Tex.2002).

As the court of appeals noted, "[s]atire, particularly realistic satire, is ... a distortion of the familiar with the pretense of reality in order to convey an underlying critical message." 91 S.W.3d at 854. According to one commentator, satire "deals with actual cases, mentions real people by name or describes them unmistakably (and often unflatteringly), talks of this moment and this city, and this special, very recent, very fresh deposit of corruption whose stench is still in the satirist's curling nostrils." GILBERT HIGHET, THE ANATOMY OF SATIRE 16 (1962). "Satire is particularly relevant to political debate because it tears down facades, deflates stuffed shirts, and unmasks hypocrisy. By cutting through the constraints imposed by pomp and ceremony, it is a form of irreverence as welcome as fresh air." Falwell v. Flynt, 805 F.2d 484, 487 (4th Cir.1986) (Wilkinson, J., dissenting), rev'd sub nom. Hustler Magazine v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). Perhaps the most famous example of satire is Jonathan Swift's 1729 essay, "A Modest Proposal,"[4] in which he advocated that the children of the Irish poor be sold and slaughtered for meat. The article was intended to criticize English landlords and political economists, but Swift was widely criticized by those who misunderstood the satire.

In this country too, there has been a long and storied "tradition of satiric comment." Falwell, 805 F.2d at 487.

> Much of the comment went overboard, and much would be considered libelous today. For all its clatter and hubbub, however, it has not undermined this country's profound respect for presidents and priests. But it has enhanced

> political debate. Nothing is more thoroughly democratic than to have the high-and-mighty lampooned and spoofed. An observant electorate may also gain by watching the reactions of objects of satiric comment, noting those who take themselves seriously and those whose self-perspective is somewhat more relaxed.

Id. at 487. Public figures generally bear the brunt of satire, and "[f]rom the Pickwick Papers of the 1830's to Colorado of the 1890's to Monty Python of the early 1970's, judges and the judiciary have been fair game for satirists." Patrick v. Superior Court, 27 Cal.Rptr.2d 883, 885 (Cal.Ct. App.1994).

█ Thus, defamation claims involving humor in general, and satire in particular, raise important issues pertaining to free speech. "Humor is an important medium of legitimate expression and central to the well-being of individuals, society, and their government. Despite its typical literal 'falsity,' any effort to control it runs severe risks to free expression as dangerous as those addressed to more 'serious forms of communication.'" ROBERT D. SACK, SACK ON DEFAMATION § 5.5.2.7.1 (3d ed.2004) (hereafter "SACK ON DEFAMATION").[5]

> Is there a recognized exception from the laws of libel when words otherwise defamatory are uttered in a humorous context? Of course, common sense tells us there must be. Humor takes many forms—sheer nonsense, biting satire, practical jokes, puns (clever and otherwise), one-liners, ethnic jokes, incongruities, and rollicking parodies, among others. Laughter can soften the blows dealt by a cruel world, or can sharpen the cutting edge of truth. Without hu-

---

4. The full title is "A Modest Proposal for preventing the children of poor people in Ireland, from being a burden on their parents or country, and for making them beneficial to the public."

5. Judge Robert Sack sits on the United States Court of Appeals for the Second Circuit.

mor—the ability to recognize the ridiculous in any situation—there can be no perspective. Humor is a protected form of free speech, just as much to be given full scope, under appropriate circumstances, as the political speech, the journalistic expose, or the religious tract. *Salomone v. MacMillan Publ'g Co.,* 97 Misc.2d 346, 411 N.Y.S.2d 105, 108 (Sup. Ct.1978), *rev'd on other grounds,* 77 A.D.2d 501, 429 N.Y.S.2d 441 (N.Y.App. Div.1980).

We must consider, then, how best to balance potential defamation liability with constitutional concerns when a satirical communication is at issue. One commentator suggests that "[a]dequate protection for most humor can be found in ordinary common-law defamation principles." Sack on Defamation § 5.5.2.7.1.

> Much humor is a form of opinion or criticism, protected under the common-law defense of "fair comment" or the doctrines suggested by the Supreme Court cases: that there are "constitutional limits on the type of speech which may be the subject of state defamation actions," such as "rhetorical hyperbole" and "vigorous epithets," and the requirement that the statements at issue be reasonably interpreted as alleging facts. Humor is usually understood to be humor and to convey no serious, objective factual allegations about its target. Although perhaps annoying or embarrassing, humorous statements will have no substantial impact on reputation and therefore ought not to be held to be defamatory. Incidental jibes and barbs may be humorous forms of epithets or "mere name-calling" and are not actionable under settled law governing such communications. And it is on these bases that most humor cases are decided.

*Id.* (citations omitted).

The United States Supreme Court, sensitive to the constitutional issues involved in imposing liability for speech, has applied the *New York Times v. Sullivan* standard to a case involving parody. *See Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). In that case, evangelist Jerry Falwell sued Hustler Magazine over an ad parody published in Hustler's November 1983 issue. The inside front cover of that issue featured a parody of an advertisement for Campari Liqueur that contained Falwell's name and photograph and was entitled "Jerry Falwell talks about his first time." Hustler modeled the parody after actual Campari ads that included interviews with various celebrities who discussed their "first times." Although it was apparent by the end of the interviews that the ads referred to the celebrities' first experience sampling Campari, "the ads clearly played on the sexual double entendre of the general subject of 'first times.'" *Id.* at 48, 108 S.Ct. 876. The Hustler parody's form and layout mimicked the Campari ads. Hustler's editors selected Falwell as the featured celebrity and drafted an alleged "interview" with him in which he stated that his "first time" was during a drunken incestuous rendezvous with his mother in an outhouse. *Id.* The parody depicted Falwell and his mother as drunk and immoral and suggested that Falwell was a hypocrite who preached only when drunk. *Id.* At the bottom of the page, the ad bore the disclaimer, "ad parody—not to be taken seriously." *Id.* at 49, 108 S.Ct. 876. The magazine's table of contents also identified the ad as "Fiction; Ad and Personality Parody." *Id.*

The jury found that the Hustler ad parody could not " 'reasonably be understood as describing actual facts about [Falwell] or actual events in which [he] participated'" and returned a verdict in Hustler's favor on Falwell's defamation claim. *Id.* at

57, 108 S.Ct. 876 (quoting appendix to petition for certiorari). Nonetheless, the jury awarded Falwell damages for intentional infliction of emotional distress, and the Fourth Circuit Court of Appeals affirmed. *Falwell v. Flynt,* 797 F.2d 1270, 1278 (4th Cir.1986). The Supreme Court granted certiorari to "consider whether [the intentional infliction of emotion distress] award [was] consistent with the First and Fourteenth Amendments of the United States Constitution." *Falwell,* 485 U.S. at 48, 108 S.Ct. 876. Chief Justice Rehnquist, writing for the Court, concluded that "public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with 'actual malice,' *i.e.,* with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Id.* at 56, 108 S.Ct. 876.

The Court noted that the *New York Times Co. v. Sullivan* actual malice standard protected the parody from an intentional infliction of emotional distress claim:

> Since *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), we have consistently ruled that a public figure may hold a speaker liable for the damage to reputation caused by publication of a defamatory falsehood, but only if the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.,* at 279–280, 84 S.Ct. 710. False statements of fact are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective. *See Gertz,* 418 U.S., at 340, 344, n.

9, 94 S.Ct. 2997. But even though falsehoods have little value in and of themselves, they are "nevertheless inevitable in free debate," *id.,* at 340, 94 S.Ct. 2997 and a rule that would impose strict liability on a publisher for false factual assertions would have an undoubted "chilling" effect on speech relating to public figures that does have constitutional value. "Freedoms of expression require 'breathing space.' " *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 772, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (quoting *New York Times, supra,* at 272, 84 S.Ct. 710). This breathing space is provided by a constitutional rule that allows public figures to recover for libel or defamation only when they can prove *both* that the statement was false and that the statement was made with the requisite level of culpability.

485 U.S. at 52, 108 S.Ct. 876.

The Court rejected the notion that, because the *Hustler* parody was particularly outrageous, it could be distinguished from traditional political cartoons:

> There is no doubt that the caricature of respondent and his mother published in Hustler is at best a distant cousin of the political cartoons described above, and a rather poor relation at that. If it were possible by laying down a principled standard to separate the one from the other, public discourse would probably suffer little or no harm. But we doubt that there is any such standard, and we are quite sure that the pejorative description "outrageous" does not supply one. "Outrageousness" in the area of political and social discourse has an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike

of a particular expression. An "outrageousness" standard thus runs afoul of our longstanding refusal to allow damages to be awarded because the speech in question may have an adverse emotional impact on the audience. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 910, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) ("Speech does not lose its protected character ... simply because it may embarrass others or coerce them into action"). And, as we stated in *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978): "The fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection. For it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *Id.,* at 745–746, 98 S.Ct. 3026. *See also Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969)("It is firmly settled that ... the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.").

*Id.* at 55–56, 108 S.Ct. 876. The Court concluded that Falwell's intentional infliction of emotional distress claim could not, "consistently with the First Amendment, form a basis for the award of damages when the conduct in question is the publication of a caricature such as the ad parody involved here." *Id.* at 57, 108 S.Ct. 876. Accordingly, the Supreme Court reversed the court of appeals' judgment.[6] *Id.*

## A. The Reasonable Reader and "Stop the madness"

Thus, we must "consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). We are guided in our analysis by the United States Supreme Court's handling of the constitutional issues presented by the ad parody in *Falwell.* Additionally, we agree with Judge Sack's observation that common-law defamation principles—with some adjustments—provide adequate protection for satire. SACK ON DEFAMATION § 5.5.2.7.1. We turn, then, to our standards for evaluating allegedly defamatory communications.

"We have long held that an allegedly defamatory publication should be construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex.2000) (citing *Musser v. Smith Protective Servs.,* 723 S.W.2d 653, 655 (Tex.1987), *Guisti v. Galveston Tribune Co.,* 105 Tex. 497, 150 S.W. 874, 878 (1912), and *Kapellas v. Kofman,* 1 Cal.3d 20, 81 Cal.Rptr. 360, 459 P.2d 912 (1969)(en banc)). Falsity for constitutional purposes depends upon the meaning a reasonable person would attribute to a publication, and not to a technical analysis of each statement. *Id.* at 116, 81 Cal.Rptr.

---

**6.** In a two sentence concurrence, Justice White wrote, "As I see it, the decision in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), has little to do with this case, for here the jury found that the ad contained no assertion of fact. But I agree with the Court that the judgment below, which penalized the publication of the parody, cannot be squared with the First Amendment." *Falwell,* 485 U.S. at 57, 108 S.Ct. 876 (White, J., concurring).

360, 459 P.2d 912. Whether a publication is capable of a defamatory meaning is initially a question for the court. *Id.* at 114, 81 Cal.Rptr. 360, 459 P.2d 912. But when a publication is of ambiguous or doubtful import, the jury must determine its meaning. *Id.*

We have never before applied these principles to a satirical article, however. New Times asserts that "Stop the madness" is rhetorical hyperbole, protected under the First Amendment. *See, e.g., Letter Carriers v. Austin,* 418 U.S. 264, 282–83, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Greenbelt Co-op. Pub. Ass'n v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). In *Greenbelt,* the Supreme Court considered whether a newspaper story that referred to a position the plaintiff had taken at city council meetings as "blackmail" was actionable. 398 U.S. at 7, 90 S.Ct. 1537. The trial court and the court of appeals viewed the use of the word as charging the crime of blackmail, and because the paper knew the plaintiff had committed no such crime, it was liable for the "knowing use of falsehood." *Id.* at 6, 90 S.Ct. 1537. The Supreme Court rejected this holding:

> We hold that the imposition of liability on such a basis was constitutionally impermissible—that as a matter of constitutional law, the word 'blackmail' in these circumstances was ... not libel.... No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who consider Bresler's negotiating position extremely unreasonable.

*Greenbelt,* 398 U.S. at 13–14, 90 S.Ct. 1537. Similarly, in *Letter Carriers,* the Supreme Court held that a publication's description of non-union individuals as "scabs" was not actionable. Relying on *Greenbelt,* the Court noted that it was "similarly impossible to believe that any reader ... would have understood the newsletter to be charging the appellees with committing the criminal offense of treason. As in [*Greenbelt* ], Jack London's 'definition of a scab' is merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members towards those who refuse to join." *Letter Carriers,* 418 U.S. at 285–86, 94 S.Ct. 2770.

Most recently, in *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the Supreme Court noted that the "[*Greenbelt* ]–*Letter Carriers*–*Falwell* line of cases provide protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Id.* at 20, 90 S.Ct. 1537 (quoting *Falwell,* 485 U.S. at 50, 108 S.Ct. 876); *see also* Eric Scott Fulcher, *Rhetorical Hyperbole and the Reasonable Person Standard: Drawing the Line Between Figurative Expression and Factual Defamation,* 38 GA. L.REV. 717, 735 (2004). "This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695.

Other courts have applied these holdings to create a workable standard for cases involving satire or parody. *See, e.g.,* SACK ON DEFAMATION § 5.5.2.7.1; *see also* Jan Kipp Kreutzer, *Defamation: Problems with Applying Traditional Standards to Non–Traditional Cases—Satire, Fiction and "Fictionalization,"* 11 N. KY. L.REV. 131, 134 (1984) (noting that "[t]he *Greenbelt* 'rhetorical hyperbole' principle has ... been helpful to defendants in cases involving humor, satire and new

types of literary expression"). For example, in *Pring v. Penthouse Int'l, Ltd.*, 695 F.2d 438 (10th Cir.1982), *cert. denied*, 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983), the court considered the appropriate test for determining whether Penthouse could be liable for publishing a spoof of the Miss America contest. In that case, Penthouse published an article about "Charlene," a Miss Wyoming at the Miss America pageant. The article described Miss Wyoming during the talent portion of the competition and depicted her performing sexual acts with her coach and others. The real Miss Wyoming sued Penthouse for defamation. The jury found that the plaintiff Pring was the Miss Wyoming about· whom the article was written. Nonetheless, the Tenth Circuit Court of Appeals reversed the district court's judgment and directed the trial court to set aside the verdict and dismiss the action. Relying on *Letter Carriers* and *Greenbelt*, the court held:

> The test is not whether the story is or is not characterized as "fiction," "humor," or anything else in the publication, but *whether the charged portions in context could be reasonably understood as describing actual facts about the plaintiff or actual events in which she participated.* If it could not be so understood, the charged portions could not be taken literally. This is clearly the message in *Greenbelt* and *Letter Carriers.*

695 F.2d at 442 (emphasis added). The court concluded that, because the story described something physically impossible in an impossible setting, it was "simply impossible to believe that a reader would not have understood that the charged portions were pure fantasy and nothing else." *Id.* at 443.

In *Hustler Magazine v. Falwell*, the district court incorporated the *Pring* test into the jury instructions on Falwell's libel claim. 485 U.S. at 57, 108 S.Ct. 876 (jury found that "the Hustler ad parody could not 'reasonably be understood as describing actual facts about [respondent] or actual events in which [he] participated.'" (quoting appendix to petition for certiorari)); Brief for the Petitioners at 21, *Hustler Magazine v. Falwell,* (No. 86–1278); *see also Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695. Other courts have adopted variations of this test. *See, e.g., Dworkin v. Hustler Magazine, Inc.,* 867 F.2d 1188, 1193–94 (9th Cir.1989) (Hustler features mentioning Dworkin's name in a derogatory fashion were "privileged opinion" because they could not be "reasonably understood as statements of fact."); *San Francisco Bay Guardian, Inc. v. Superior Court,* 17 Cal.App.4th 655, 21 Cal.Rptr.2d 464, 467 (1993) (average reader would recognize phony letter to the editor as "a fake and a joke"); *Walko v. Kean College,* 235 N.J.Super. 139, 561 A.2d 680, 683 (Ct. Law Div.1988) ("A parody or spoof that no reasonable person would read as a factual statement, or as anything other than a joke—albeit a bad joke—cannot be actionable as a defamation.") (citing *Pring*); *Myers v. Boston Magazine Co., Inc.,* 380 Mass. 336, 403 N.E.2d 376, 379 (1980) (reasonable reader would not understand satire to state actual fact); *Garvelink v. Detroit News,* 206 Mich.App. 604, 522 N.W.2d 883, 886 (1994) (As a matter of law, satirical article could not "reasonably be interpreted as stating actual facts about the plaintiff and ... is, therefore, protected speech."); *Hoppe v. Hearst Corp.,* 53 Wash.App. 668, 770 P.2d 203, 206 (1989) (adopting *Pring* test and holding that parody was non-actionable as a matter of law).

■ We believe *Pring* appropriately sets the standard for liability in cases of satire or parody, while providing freedom of expression its necessary "breathing

space." *Falwell,* 485 U.S. at 52, 108 S.Ct. 876. Thus, in such cases, the test is whether the publication could be reasonably understood as describing actual facts. *Pring,* 695 F.2d at 442. Although the court of appeals' articulation of this standard was largely correct, *see* 91 S.W.3d at 855 (holding that statements are protected "if a reasonable reader would understand that they do not state an actual fact" and "the meaning of a publication, and thus whether it is false and defamatory, depends upon how a person of ordinary intelligence would perceive the publication") (citing *Turner,* 38 S.W.3d at 114), we disagree with the conclusion that "[t]he *Dallas Observer* provided *no obvious clues* to the average reader that the article was not conveying statements of actual fact" and "the 'Stop the madness' article fails to provide *any notice* to a reasonable reader that it was a satire or parody." 91 S.W.3d at 857, 859 (emphasis added).

■ The court of appeals has underestimated the "reasonable reader."

As the relevant cases show, the hypothetical reasonable person—the mythic Cheshire cat who darts about the pages of the tort law—is no dullard. He or she does not represent the lowest common denominator, but reasonable intelligence and learning. He or she can tell the difference between satire and sincerity.

*Patrick v. Superior Court,* 27 Cal.Rptr.2d 883, 887 (Cal.Ct.App.1994). The person of "ordinary intelligence" described in *Turner* is a prototype of a person who exercises care and prudence, but not omniscience, when evaluating allegedly defamatory communications. *See Turner,* 38 S.W.3d at 114; *see also Patrick,* 27 Cal.Rptr.2d at 887–88.

■ The appropriate inquiry is objective, not subjective. Thus, the question is not whether some actual readers were mislead, as they inevitably will be,[7] but whether the hypothetical reasonable reader could be. *See San Francisco Bay Guardian v. Superior Court,* 17 Cal.App.4th 655, 21 Cal.Rptr.2d 464, 467(1993) ("The fact that real party furnished declarations of a few people who stated that they did not recognize the letter as a joke does not raise a question of fact as to the view of the average reader. The question is not one that is to be answered by taking a poll of readers but is to be answered by considering the entire context in which the offending material appears."); *see also* BRUCE W. SANFORD, LIBEL & PRIVACY 193–

7. For example, earlier this year, the *Beijing Evening News,* in a story written by Huang Ke, reported that Congress was threatening to bolt Washington, D.C. unless it got a new, modern Capitol building, complete with retractable roof. Daniel Terdiman, *Onion Taken Seriously, Film at 11,* WIRED, April 14, 2004, at http://www.wired.com/news/culture/0,1284,63048,00.html (last visited Sept. 1, 2004 and available in Clerk of Court's file). Unfortunately, Ke's source for this information was *The Onion,* the satirical publication that bills itself as "America's Finest News Source." *Id.* The *Evening News* later apologized but blamed *The Onion,* writing that "[s]ome small American newspapers frequently fabricate offbeat news to trick people into noticing them with the aim of making money." *Id.* (quoting *Beijing Evening News* ). According to Carol Kolb, *Onion* editor, "People every single day think *The Onion* stories are real." *Id.* One piece, called "Al–Qaida Allegedly Engaging in Telemarketing," prompted the Branch County, Michigan sheriff's department to issue an urgent press release warning of the purported practice. *Id.* In a similar vein, an article entitled "Chinese Woman Gives Birth to Septuplets: Has One Week to Choose" provoked prayer vigils on behalf of the six babies who would be rejected. *Id.* Additionally, Deborah Norville reported on MSNBC that more than half of all exercise done in the United States happens in TV infomercials for workout machines, a "statistic" obtained from an *Onion* article. *Id.*

94(2d ed. 1991) ("Dry irony . . . creates a greater risk of being misunderstood as an assertion of fact than slapstick, but nonetheless it is entitled to protection. We should hardly encourage the development of libel law that rewards low humor."). Thus, we focus on a single objective inquiry: whether the satire can be reasonably understood as stating actual fact.

■ This is not the same as asking whether all readers actually understood the satire, or "got the joke." Intelligent, well-read people act unreasonably from time to time, whereas the hypothetical reasonable reader, for purposes of defamation law, does not. In a case of parody or satire, courts must analyze the words at issue with detachment and dispassion, considering them in context and as a whole, as the reasonable reader would consider them.

■ In this case, the court of appeals distinguished other cases finding satire to be protected under the First Amendment, holding that, in those cases, "the reader was given obvious clues that the piece was not conveying statements of actual facts." 91 S.W.3d at 858. But, to a careful reader, the clues here are no less suggestive. They include:

- the unorthodox headline ("Stop the madness") and photo of a smiling child holding a stuffed animal, captioned "Do they make handcuffs this small? Be afraid of this little girl."
- the article's assertion that the six-year-old child was placed in ankle shackles due to her school disciplinary record, "which included reprimands for spraying a boy with pineapple juice and sitting on her feet."
- the fabricated quote attributed to then-Governor George W. Bush, stating that *Where the Wild Things Are* "clearly has deviant, violent, sexual

overtones" and that "zero tolerance means just that. We won't tolerate anything."
- reference to Isaacks's "quote" that "[w]e've considered having her certified to stand trial as an adult, but even in Texas there are some limits."
- Judge Whitten's alleged statement that "[a]ny implication of violence in a school setting . . . is reason enough for panic and overreaction."
- The article's reference to a freedom-opposing religious group that bears a ridiculous acronym: God Fearing Opponents of Freedom ("GOOF").
- Six-year-old Cindy Bradley's scoffing at the reaction to her book report and saying, "Like, I'm sure. It's bad enough people think like Salinger and Twain are dangerous, but Sendak? Give me a break, for Christ's sake. Excuse my French."

These clues (among others) involve "exaggeration or distortion," the means by which "the satirist clearly indicates to his audience that the piece does not purport to be a statement of fact but is rather an expression of criticism or opinion, a means of reaching an abstract truth or idea." Jan Kipp Kreutzer, *Defamation: Problems with Applying Traditional Standards to Non–Traditional Cases—Satire, Fiction and "Fictionalization,"* 11 N. Ky. L.Rev. 131, 144 (1984). And their combined effect provides a signal to the reasonable reader that the piece is satirical. Would a six-year-old be able to comment intelligently on the works of Salinger and Twain, while using expressions like "[e]xcuse my French"? Would a faith-based organization label itself "GOOF"? Would a judge say that it is time to panic and overreact? *See Patrick*, 27 Cal.Rptr.2d at 887 ("[T]he reasonable person has some feel for the nuances of law and language."). The reasonable reader would not consider

each of these clues in isolation, but would synthesize each signal as part of the larger determination of whether "Stop the madness" can reasonably be interpreted as stating actual facts.

 Some satire, like the article at issue here,

> relies for its force and effect on the idea of attribution of ideas and words to someone who never uttered them. The satiric effect emerges only as the reader concludes by the very outrageousness of the words that the whole thing is a put-on. The comic effect is achieved because the reader sees the words as the absurd expression of positions or ideas associated with the purported author.

*Patrick,* 27 Cal.Rptr.2d at 886. It is not surprising, therefore, that respondents complain that only readers who read the entire article would "get" the joke. As they argue, "many readers will read the first few paragraphs of an article and form an opinion." But we cannot impose civil liability based on the subjective interpretation of a reader who has formed an opinion about the article's veracity after reading a sentence or two out of context; that person is not an objectively reasonable reader. *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 583, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) ("First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed.").

The court of appeals found it persuasive that the article was "indexed and published as the lead story under the heading of 'News' in a section ordinarily devoted to hard-hitting investigative news." 91 S.W.3d at 859. The article's inclusion in the *Observer's* "News" section must be examined in the context of the *Observer's* nature, however, because the reasonable reader must consider the type of publication in which the offending material appears. *See, e.g.,* BRUCE W. SANFORD, LIBEL AND PRIVACY 193 n. 187 (2d ed. 1999) ("The context that a humorous article appears in may determine the outcome in a close case."); *Myers v. Boston Magazine Co., Inc.,* 380 Mass. 336, 403 N.E.2d 376, 379 (1980) (courts must "examine the statement in its totality in the context in which it was uttered," including the medium in which it was published and the audience to whom it was disseminated); *Walko v. Kean College,* 235 N.J.Super. 139, 561 A.2d 680, 684 (Ct. Law Div.1988) ("Our case law has made it abundantly clear that a challenged publication must be viewed in context to determine whether or not it is subject to a defamatory meaning."); *see also Musser v. Smith Protective Servs., Inc.,* 723 S.W.2d 653, 655 (Tex.1987) ("The court construes the statement as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement.").

Here, the record establishes that the *Dallas Observer* is an alternative weekly newspaper that "report[s] the news in context and with perspective and sometimes with an individual's voice." Julie Lyons, the *Observer's* editor, described the newspaper as follows:

> at a daily newspaper when you're reporting a news story, you might write the mayor said so-and-so and the counsel [sic] member said so-and-so. We call that a he said she said kind of story. Whereas at the *Dallas Observer* we might say the mayor said so-and-so. The counsel [sic] member said so-and-so, but the counsel [sic] member's lying.

The "News" heading was used to delineate a section of the newspaper and not to indicate that articles contained in that section were "traditional news"—in fact the record establishes that opinion, commentary, and satire had previously been pub-

lished in the "News" section, as the *Observer* did not have a separate opinion section. Additionally, the court of appeals' statement that "Stop the madness" was "both indexed and published as the lead story under the heading of 'News,'" 91 S.W.3d at 859, appears to be erroneous— the article was not the lead story and was not indexed at all; it was not even mentioned in the table of contents. The nearby article describing awards won by *Observer* staff could suggest that "Stop the madness" was a news article, but it is just one of many factors to be considered. *Cf. Walko v. Kean College*, 235 N.J.Super. 139, 561 A.2d 680, 684 (Ct. Law Div.1988) (fact that parody was surrounded by other, humorous articles supported interpretation that reasonable reader would not have taken it seriously).

Moreover, "Stop the madness" was not the first satire the *Observer* published. In earlier issues, the *Observer* had spoofed the music industry's issuance of "[b]oring and exhaustive box sets of irrelevant material"; the Dallas Area Rapid Transit light rail system (providing tips for safer rides, including "never lend your handgun to a stranger," "share your ammo," and "carry tissues, Lysol, and an extra drool cup for your seatmate"); and the Belo Corporation's part ownership of the Dallas Mavericks (in an article entitled "Belo's Sure Got Balls"). Perhaps the *Observer's* general tenor can best be gleaned by examining the November 18, 1999 *Buzz* column, in which Patrick Williams explained the *Observer's* decision to lampoon Isaacks and Whitten. Williams wrote:

> The reaction [to the Christopher Beamon incident] at the *Observer* was that this was an outrageous, idiotic abuse of power. OK, we didn't express it quite that way. "Whoa, dude, that's f[* *]ked up," is closer to what was said. Luckily for us, we work for a newspaper that lets us ridicule the ridiculous. Farley,

> grinning like a rottweiler about to bite a baby, drew the writer's sharpest weapon, satire, and set about to make a few points.

Patrick Williams, *Buzz*, DALLAS OBSERVER, November 18–24, 1999, at 9 (expletive deleted).

The reference in "Stop the madness" to the actual Beamon incident provides yet another signal to the reasonable reader, who would have understood the satire to be commentary on that controversy. *See, e.g., Lane v. Ark. Valley Publ'g Co.*, 675 P.2d 747, 750–51 (Colo.Ct.App.1983) (noting that context in which satirical articles were published was significant: "comments made in the context of a hotly contested political campaign should not be judged by the same standard as those made in other contexts" and topics at issue "had been the subject of extensive reporting and controversy"); *Garvelink*, 522 N.W.2d at 887 (column was "obviously satire intended to criticize the school budget cuts, which was a controversial issue at the time"); *Hoppe*, 770 P.2d at 207 (satirical column critical of plaintiffs' use of public funds was published during a political campaign and in the context of "a well publicized debate" over the plaintiff's use of public funds to hire detectives); *see also Patrick*, 27 Cal.Rptr.2d at 889–90 (when viewed in the context of the "running feud" between the judge and the newspaper, it was unreasonable to believe that judge himself had written phony, satirical memo). It does not, as the court of appeals held, support a finding that a reasonable reader would have misunderstood the satire. 91 S.W.3d at 859.

■ Finally, while a disclaimer would have aided the reasonable reader in determining the article was a satire, such a disclaimer is not necessarily dispositive. *See, e.g., Falwell v. Flynt*, 805 F.2d at 486–

87 (Wilkinson, J., dissenting) (noting that, despite label proclaiming "Ad Parody— Not to be Taken Seriously," Flynt could have been subject to a libel judgment if the publication were found to be defamatory); *Pring v. Penthouse Int'l, Ltd.,* 695 F.2d 438 (10th Cir.1982) ("The test is not whether the story is or is not characterized as 'fiction,' 'humor,' or anything else in the publication" but whether story could reasonably be interpreted as stating actual fact). Rather, the presence of a disclaimer is one of many signals the reasonable reader may consider in evaluating a publication. *See, e.g., San Francisco Bay Guardian v. Superior Court,* 17 Cal.App.4th 655, 21 Cal.Rptr.2d 464, 466 (1993) (noting that "[t]he question of whether the average reader would have recognized the issue as a parody and the letter as a part of the joke depends upon a view of the entire issue, i.e., the 'totality of circumstances' "; fact that phony letter to the editor was in a section of the newspaper labeled "special parody section" was significant).

"Stop the madness" does have a superficial degree of plausibility, but such is the hallmark of satire. *See, e.g.,* Jon M. Garon, *Media & Monopoly in the Information Age: Slowing the Convergence at the Marketplace of Ideas,* 17 CARDOZO ARTS & ENT. L.J. 491, 557 (1999) ("Satire works precisely because it evokes other materials."); *cf. San Francisco Bay Guardian v. Superior Court,* 17 Cal.App.4th 655, 21 Cal.Rptr.2d 464, 466 (1993) ("[T]he very nature of parody ... is to catch the reader off guard at first glance, after which the 'victim' recognizes that the joke is on him to the extent that it caught him unaware."). That does not necessarily make it actionable, however. While a reader may initially approach the article as providing straight news, "Stop the madness" contains such a procession of improbable quotes and unlikely events that a reasonable reader could only conclude that the article was satirical. On

balance, the obvious clues in the article itself, the *Observer's* general and intentionally irreverent tone, its semi-regular publication of satire, as well as the satire's timing and commentary on a then-existing controversy, lead us to conclude that "Stop the madness" could not reasonably be understood as stating actual facts about Isaacks and Whitten. The court of appeals erred in holding otherwise.

## B. Actual Malice

 Even if the article were reasonably understood as stating actual facts about the respondents, however, respondents could proceed with their claim only if they raised a fact issue on actual malice. Public figures cannot recover for defamatory statements made about them absent proof of actual malice. *Forbes, Inc. v. Granada Biosciences, Inc.,* 124 S.W.3d 167, 170–71 (Tex.2003) (citing *N.Y. Times,* 376 U.S. at 279–80, 84 S.Ct. 710 and *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998)). But "[t]he phrase actual malice is unfortunately confusing in that it has nothing to do with bad motive or ill will," but rather is "a shorthand to describe the First Amendment protections for speech injurious to reputation." *Bentley v. Bunton,* 94 S.W.3d 561, 590 (Tex. 2002) (quoting *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 666 n. 7, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) and *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 511, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991)); *Letter Carriers,* 418 U.S. at 281, 94 S.Ct. 2770 ("[I]mpos[ing] liability on the basis of the defendant's hatred, spite, ill will, or desire to injure [is] 'clearly impermissible.' "); *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 82, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967) (noting actual malice cannot be based merely on defendant's " 'bad or corrupt motive,' " " 'personal spite, ill will or a

desire to injure plaintiff' "). As the Supreme Court noted:

[I]n the world of debate about public affairs, many things done with motives that are less than admirable are protected by the First Amendment. In *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), we held that even when a speaker or writer is motivated by hatred or ill will his expression was protected by the First Amendment: "Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth." *Id.,* at 73, 88 S.Ct. 197.
Thus while such a bad motive may be deemed controlling for purposes of tort liability in other areas of the law, we think the First Amendment prohibits such a result in the area of public debate about public figures.

*Falwell,* 485 U.S. at 53, 108 S.Ct. 876.

▮▮▮▮ Instead, "actual malice" requires proof that the defendant made a statement " 'with knowledge that it was false or with reckless disregard of whether it was true or not.' " *Huckabee v. Time Warner Entm't Co.,* 19 S.W.3d 413, 420 (Tex.2000) (quoting *N.Y. Times,* 376 U.S. at 279–80, 84 S.Ct. 710). Reckless disregard is a subjective standard, focusing on the defendant's state of mind. *Bentley,* 94 S.W.3d at 591. Mere negligence is not enough. *Id.* Rather, the plaintiff must establish " 'that the defendant in fact entertained serious doubts as to the truth of his publication,' " or had a " 'high degree of awareness of . . . [the] probable falsity' " of the published information. *Id.* (quoting *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)). Constitu-

tional malice generally consists of " '[c]alculated falsehood.' " *Bunton,* 94 S.W.3d at 591 (quoting *Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). When the defendant's words lend themselves to more than one interpretation, the plaintiff must establish either that the defendant knew that the words would convey a defamatory message, or had reckless disregard for their effect. *See Bunton,* 94 S.W.3d at 603.

Applying the actual malice standard to a satirical work may "become[ ] confused because the author is usually well aware of any 'falsity' contained in the comment and indeed intends no 'truth.' That sounds like 'actual malice.' " SACK ON DEFAMATION § 5.5.2.7.1. Respondents advocate this very sort of "automatic actual malice" standard in satire cases, because the author always knows the publication contains false statements of fact. They assert that "[i]n the parody context, the reporter's subjective belief is irrelevant, because he always knows that what he is publishing is not true." But we cannot square such a blanket rule with the protections of the First Amendment. In a pre-*Hustler Magazine v. Falwell* text, one commentator warned against a literal application of the *New York Times* rule in the satire/parody context:

[I]f someone wishes to convey the notion that a particular American president is ineffective, he should not be limited to expressing that view by saying it in so many words. He should be permitted to convey the view more dramatically through the use of admittedly invented verbal images.
The problem . . . may be that courts will follow too literally the fact/opinion dichotomy suggested in *Gertz,* find that knowingly false assertions *of fact* have been made, and conclude that such assertions are unprotected both under

common law and constitutional principles. It may be difficult, depending on the particular work and the particular forum, to persuade a judge that statements of fact are, under certain circumstances, not statements of fact at all, but of opinion.

ROBERT D. SACK, LIBEL, SLANDER AND RELATED PROBLEMS § V.6.5.7, at 246–47 (1980).

In *Hustler Magazine v. Falwell,* the United States Supreme Court implicitly rejected a literal application of the actual malice rule to works involving satire or parody. If the Supreme Court had literally applied the actual malice test as set forth in *Falwell,* it would have found liability because neither party contested the fictional nature of the parody, and Hustler knew the statements were fictional when it published the article. While the Supreme Court does not detail how to apply this standard to cases of satire or parody, its rejection of liability means that it could not have applied the standard literally.

 New Times asserts that the court of appeals' articulation of the actual malice test was "largely appropriate," and we agree. The court of appeals, citing *Turner,* articulated the issue as: "Did the publisher either know or strongly suspect that the article was misleading or presented a substantially false impression?" 91 S.W.3d at 862. As this is not a case of libel by impression (as *Turner* was), however, we believe the inquiry is more properly stated as: did the publisher either know or have reckless disregard for whether the article could reasonably be

interpreted as stating actual facts? [8] *Bentley,* 94 S.W.3d at 603; *see also Pring,* 695 F.2d at 442.

In conducting the actual malice inquiry, the court of appeals dismissed the individual defendants' affidavits as "conclusory and ... therefore not competent summary judgment evidence." 91 S.W.3d at 863. Additionally, the court concluded that the affidavits of Farley, Williams, and Lyons were controverted by their deposition testimony. *Id.* We disagree with both propositions.

In *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex.1989), we held that a reporter's summary judgment affidavit could conclusively establish a lack of actual malice so long as it was "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." As we later noted:

Although we chose in *Casso* not to carve out a special exception to our summary judgment practice for public figure and public official defamation cases, the court, in overruling *Bessent* [*v. Times-Herald,* 709 S.W.2d 635 (Tex. 1986)] and *Beaumont Enterprise* [*& Journal v. Smith,* 687 S.W.2d 729 (Tex. 1985)] made it possible for defendants to obtain a summary judgment in such cases. In *Casso,* the defendant (Casso) submitted an affidavit and supporting evidence establishing that he did not believe that certain allegations he made were false and that he did not act with reckless disregard as to their truth or falsity in

---

8. New Times proposes that the Court adopt Chief Justice Phillips's concurrence in *Bentley,* which advocated an "intent" standard for actual malice. *Bentley,* 94 S.W.3d at 616 (Phillips, C.J., concurring and dissenting) (actual malice requires proof "that the defendants intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material") (quoting

*Saenz v. Playboy Enters., Inc.,* 841 F.2d 1309, 1318 (7th Cir.1988)) (emphasis added). In fact, the trial court applied this standard but found a fact issue on actual malice. Under either an intent standard or a knowledge standard, however (as more fully explained below), Isaacks and Whitten have failed to raise a fact issue on actual malice.

repeating those allegations in his campaign advertising. As evidence supporting his motion for summary judgment, Casso submitted his affidavit and certain testimony from a pending federal trial. He asserted in his affidavit that this testimony formed the basis of his allegedly defamatory statements. The court in *Casso* held that because the plaintiff, Brand, "presented no controverting proof, summary judgment as to these statements was proper."

*Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex. 1989) (holding that defendants' affidavits and deposition testimony negated actual malice where plaintiff "presented no controverting proof that [the defendants] believed that the statements in question were false or published with reckless disregard for the truth"); *see also Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 417 (Tex.2000); *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 574 (Tex.1998). Thus, under our framework, because these affidavits are from interested witnesses, they will negate actual malice as a matter of law only if they are "clear, positive, and direct, otherwise credible and free from contradictions and inconsistencies, and [able to be] readily controverted." Tex.R. Civ. P. 166a(c); *see also Huckabee*, 19 S.W.3d at 424; *Casso*, 776 S.W.2d at 558.

In support of its summary judgment motion on actual malice, New Times presented affidavits from Farley, Williams, and Lyons. The affidavits detailed the writing, editing, and publication of "Stop the madness." In her affidavit, Farley explained that she "had the idea to write something for the Dallas Observer that would be a takeoff or satire of the Beamon incident." She described a conversation with Williams in which they discussed whether they wanted the story to be a "prank intended to fool readers or whether the story should be outrageous enough that the readers would be let in on the joke.... We agreed that [the story] should be constructed so that readers would be attracted to it and then would clearly be signaled that the article was a satire or parody." Farley testified that she never intended that the article be taken as an account of actual events and that she neither knew nor believed that it would be understood that way. She detailed "very specific steps to make sure that this was obviously a satire," including using a very young child as protagonist, placing her in ankle shackles, inventing the religious group "GOOF," and adding fictional quotes.

Williams testified in a similar vein. He explained that their "goal was to make [the story] clearly satirical while not so overbroad as to be sophomoric. We intended the article to poke fun at those involved in the Christopher Beamon matter, as well as the dry 'daily news' type of journalism that often overlooks the broader issues." Williams testified that he did not intend the article to be taken as an account of an actual event and did not know or believe that the article's readers would mistake it for one.

Like Farley and Williams, Julie Lyons, the Observer's editor-in-chief, also gave a detailed affidavit. She testified that there was no intent that "Stop the madness" be taken as stating actual historical fact. She described reviewing a draft and suggesting that the article be edited to make it funnier and more obviously satire. She described the choice to use a six-year-old: "We knew that a child that young would clearly signal to the reader that it was fictitious because a child that young can't be detained."

These affidavits are "clear, positive, and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted."

Tex.R. Civ. P. 166a(c). They are not, as the court of appeals held, "conclusory." 91 S.W.3d at 863. The affidavits do not merely deny actual malice, they provide detailed explanation of the affiants' state of mind and descriptions of steps taken to ensure that the article was understood to be fiction. The affidavits establish New Times's lack of actual malice; none of the witnesses knew or had reckless disregard for whether the satire would be taken as stating actual facts, nor is there any evidence that they intended such a result.[9] Unless Isaacks and Whitten raised a fact issue, therefore, New Times has negated actual malice as a matter of law.

◼ Isaacks and Whitten—and the court of appeals—relied on the respondents' deposition testimony. In fact, the court's actual malice finding appears to have been based largely on evidence that the Dallas Observer intended to ridicule those officials. *See* 91 S.W.3d at 863–64 (noting that Farley "admitted the article was intended to hold Isaacks and Whitten up to public ridicule"; that Williams "agreed the article was meant as satire or scathing commentary"; and that Lyons "agreed that the story would hold these public officials up to public ridicule"). But, while the statutory definition of libel under Texas law includes a statement that exposes a person to ridicule, *see* TEX. CIV. PRAC. & REM.CODE § 73.001, evidence of intent to ridicule is not evidence of actual malice. Rather, actual malice concerns the defendant's attitude toward the truth, not toward the plaintiff. *See Prozeralik v. Capital Cities Communications, Inc.*, 82 N.Y.2d 466, 605 N.Y.S.2d 218, 626 N.E.2d 34, 42 (N.Y.1993) (distinguishing between actual malice, which "focuses on the defendant's state of mind in relation to the truth or falsity of the published information," and common-law malice, which "focuses on

the defendant's mental state in relation to the plaintiff"); *Hoppe v. Hearst Corp.*, 53 Wash.App. 668, 770 P.2d 203, 208 (1989) ("The standard for finding actual malice is subjective, and focuses on the declarant's belief in, or attitude toward, the truth of the communication at issue.").

◼ Equating intent to ridicule with actual malice would curtail the "uninhibited, robust, and wide-open" public debate that the actual malice standard was intended to foster, particularly if that debate was expressed in the form of satire or parody. *Sullivan*, 376 U.S. at 270, 84 S.Ct. 710; *cf. id.* at 273, 84 S.Ct. 710 ("Criticism of [government officials'] official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their official reputations."). Moreover, relying on such evidence ignores the Supreme Court's repeated admonitions that ill will, spite, and bad motive are not the same as actual malice. Indeed, the very purpose of satire is ridicule, but this does not make it a sort of second-class speech under the First Amendment. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2017(1961) (defining "satire" as "a usu. topical literary composition holding up human or individual vices, folly, abuses, or shortcomings to censure by means of ridicule, derision, burlesque, irony, or other method sometimes with an intent to bring about improvement").

In fact, reliance on intent to ridicule as evidence of actual malice contravenes *Falwell* itself. In that case, Falwell's evidence that Flynt intended to cause him distress rested on Flynt's deposition testimony that he had intended to "upset" Falwell, that he had wanted "[t]o settle a score" because Falwell had labeled Flynt's personal life "abominable," and that Flynt wanted to

---

9. *See* footnote 8, *supra*.

"assassinate" Falwell's integrity. Deposition Testimony of Larry Flynt, *reprinted in* Joint Appendix at 113, 136, 141, *Hustler Magazine v. Falwell*, 485 U.S. at 56, 108 S.Ct. 876). Despite this evidence, the Supreme Court held that Falwell could not recover for intentional infliction of emotional distress without proof of actual malice, and the Court reversed the Fourth Circuit's judgment. As one commentator has noted, "the regulation of improper intentions, although important for the civil law of torts, is constitutionally inappropriate 'in the area of public debate about public figures.'" Robert C. Post, *The Constitutional Concept of Public Discourse: Outrageous Opinion, Democratic Deliberation, and Hustler Magazine v. Falwell*, 103 HARV. L.REV. 603, 613 (1990)(quoting *Falwell*, 485 U.S. at 53, 108 S.Ct. 876).

As further evidence of the *Observer's* purported malice, the court of appeals pointed to editor-in-chief Julie Lyons's actions: "She never considered labeling the article as parody or satire. She later realized that some readers thought that the article was real and she changed the heading of the on-line version to satire." 91 S.W.3d at 864. Lyons also responded to each reader query she received about the story and explained that it was a satire. Additionally, the court gave weight to Patrick Williams's testimony that he wrote a response in his "Buzz" column, calling readers who believed the report "cerebrally challenged" and "clueless," and that "he never considered the possibility that some-

one might not be able to tell that the article was fictional satire." *Id.* at 863.

But contrary to the court of appeals' opinion, New Times's prompt labeling and clarification in the next edition's *Buzz* column, as well as its explanatory responses to readers, evidence a lack of actual malice. *See, e.g., Washington Nat'l Ins. Co. v. Adm'rs*, 2 F.3d 192, 196 (7th Cir.1993) (holding that "subsequent statements negating any defamatory implications may show the absence of malice by demonstrating that the speaker did not contemplate the defamatory reading in the first place"); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir.1987) (noting that "[r]efusal to retract an exposed error tends to support a finding of actual malice [and][c]onversely, a readiness to retract tends to negate 'actual malice' ") (citations omitted); *Hoffman v. Washington Post Co.*, 433 F.Supp. 600, 605 (D.D.C.1977) ("[I]t is significant and tends to negate any inference of actual malice on the part of the [publisher] that it published a retraction ... in the next day's edition ...."), *aff'd*, 578 F.2d 442 (D.C.Cir.1978); *see also* SACK ON DEFAMATION § 11.1; John C. Martin, *The Role of Retraction in Defamation Suits*, 1993 U. OF CHI. LEGAL F. 293, 296 (1993) (noting that some courts "regard retraction as sufficiently probative of an absence of malice to warrant summary judgment in suits involving public figures").

█ The *Buzz* column was certainly crude and provocative, but the First Amendment does not police bad taste.[10]

---

10. As one commentator has aptly noted:

> To ask a satirist to be in good taste is like asking a love poet to be less personal. Is THE SATYRICON in good taste? Is A MODEST PROPOSAL? Swift recommends the stewing, roasting and fricaseeing of one-year-old children.... How nasty and vulgar that must have seemed.... Imagine how this went down in polite society: 'A child will

make two dishes at an Entertainment for Friends; and when the Family dines alone, the fore or hind quarter will make a reasonable Dish, and seasoned with a little Pepper or Salt will be very good Boiled on the fourth Day, especially in Winter....' Now that's considered Literature. It's called Swiftian. Back in 1729 it probably seemed,

*Cohen v. California,* 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *see also Sullivan,* 376 U.S. at 270, 84 S.Ct. 710 ("[D]ebate on public issues should be uninhibited, robust, and wide-open, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks" on public figures.); *Univ. of Notre Dame Du Lac v. Twentieth Century–Fox Film Corp.,* 22 A.D.2d 452, 256 N.Y.S.2d 301, 307 (N.Y.App.Div.1965) ("[W]e may not import the role of literary or dramatic critic into our functioning as judges in this case; and so for purposes of the law we may not reach a conclusion that the works of fiction involved in this litigation are not artistic or literary works.... Whether [the work] is good burlesque or bad, penetrating satire or blundering buffoonery, is not for us to decide. It is fundamental that courts may not muffle expression by passing judgment on its skill or clumsiness, its sensitivity or coarseness; nor on whether it pains or pleases.").

Elected public officials, like Isaacks and Whitten, must become enured to the slings and arrows of public life. *See Sullivan,* 376 U.S. at 272–73, 84 S.Ct. 710 ("[J]udges are to be treated as men of fortitude, able to thrive in a hardy climate."); *Patrick,* 27 Cal.Rptr.2d at 889 ("As judges we are public figures, and part of our job, to paraphrase Harry Truman, is to stand the heat in the kitchen."); *Polygram Records, Inc. v. Superior Court,* 170 Cal.App.3d 543, 216 Cal.Rptr. 252, 258 (1985) ("[I]f judges assumed the responsibility to decide what is amusing and made the protections of the First Amendment turn upon their views, perhaps less putative humor would be safeguarded than our restrained approach permits."). We should not "deny to the press the right to use hyperbole, under the

threat of removing the protective mantle of *New York Times,* [thereby] condemn[ing] the press to an arid, desiccated recital of bare facts." *Time, Inc. v. Johnston,* 448 F.2d 378, 384 (4th Cir.1971); *see also Berlin v. E.C. Publications, Inc.,* 329 F.2d 541, 545 (2d Cir.1964)(noting, with respect to an alleged copyright infringement, "... as a general proposition, we believe that parody and satire *are* deserving of substantial freedom—both as entertainment and as a form of social and literary criticism"), *cert. denied,* 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964).

Moreover, the court of appeals noted—correctly—that Farley "never intended a straight news story. She never interviewed Isaacks and Whitten and admitted quotes attributed to them were untrue. She denied the story was false, but admitted it was 'fictional.'" 91 S.W.3d at 863. If indeed these undisputed facts are treated as evidence of actual malice, however, there would be automatic actual malice in all cases of satire. As set forth above, this cannot be reconciled with the First Amendment as interpreted by *Falwell.*

The court of appeals' reliance on New Times's failure to conduct an independent investigation of the Beamon case is particularly misguided. *See* 91 S.W.3d at 863, 864 (noting that Farley "did no investigation into the handling of the Beamon case" and that "Lyons, who was responsible for the Dallas Observer's overall editorial policy, agreed that no one investigated the Beamon incident"). New Times's portrayal of the Beamon incident is not at issue in this case and, even if it were, failure to investigate, by itself, is no evidence of actual malice. *Bentley,* 94 S.W.3d at 595.

---

to a lot of Smith's contemporaries, bad taste and worse.

PHILIP ROTH, READING MYSELF AND OTHERS 47 (1975) (Quoting JONATHAN SWIFT, A MODEST PROPOSAL (1729)).

■ Finally, in finding a fact issue on actual malice, the court of appeals relied "[m]ost significantly" on Julie Lyons's testimony that, after the article was published, she agreed that even intelligent, well-read people could have been misled by the story. 91 S.W.3d at 864. The actual malice inquiry focuses on the defendant's state of mind at the time of publication, however. *See Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 173 (Tex.2003) (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)). When asked what she thought at the time of publication, Lyons answered that she did not know or suspect *at that time* that the satire would be misinterpreted. Her hindsight acknowledgment that some people could have been fooled is not evidence that the reasonable reader could have understood the satire to state actual facts, nor is it evidence of actual malice at the time of publication.

We hold that New Times negated actual malice as a matter of law. In light of our disposition of this issue, we do not reach the *Observer's* request that we revisit our holding in *Huckabee* to require clear and convincing evidence of actual malice at the summary judgment stage.

## IV

### Attorney's Fees and Costs

Section 51.015, Tex. Civ. Prac. & Rem. Code provides:

Costs of Appeal

In the case of an appeal brought pursuant to Section 51.014(6), if the order appealed from is affirmed, the court of appeals shall order the appellant to pay all costs and reasonable attorney fees of the appeal; otherwise each party shall be liable for and taxed its own costs of the appeal.

Tex. Civ. Prac. & Rem.Code § 15.015. Because it affirmed the trial court's order, the court of appeals ordered New Times to pay all costs and reasonable attorney's fees for the appeal. 91 S.W.3d at 864. Because we reverse that part of the court of appeal's judgment affirming the trial court order, we also reverse the court of appeals' judgment requiring New Times to pay attorney's fees and costs. Instead, pursuant to the statute, each party shall be liable for and taxed its own costs.

## V

### Conclusion

"However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 504, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (quoting *Gertz*, 418 U.S. at 339–40, 94 S.Ct. 2997). As Judge Learned Hand noted, the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." *United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y.1943), quoted in *N.Y. Times*, 376 U.S. at 270, 84 S.Ct. 710.

We reverse the court of appeals' judgment and render judgment that Isaacks and Whitten take nothing.

Justice SCHNEIDER did not participate in the decision.

### APPENDIX

# Stop the madness

### Ponder officials jail second student; first-grader's report on *Where the Wild Things Are* deemed too violent

## By Rose Farley

In the second homework-related arrest in as many weeks, a Denton County juvenile court judge jailed a Ponder student for suspicion of making a terroristic threat after the first-grader wrote a book report on the children's classic *Where the Wild Things Are*.

Cindy Bradley, a diminutive 6-year-old, was arrested without incident during "story time" at her class at Ponder Elementary School on Tuesday morning. In a court appearance later that day, Judge Darlene Whitten ordered the girl detained for 10 days at the Denton County Juvenile detention center while prosecutors contemplate whether to file charges.

"Any implication of violence in a school situation, even if it was just contained in a first-grader's book report, is reason enough for panic and overreaction," Whitten said from the bench. "It's time for you to grow up, young lady, and it's time for us to stop treating kids like children."

Cindy, dressed in blue jeans, a Pokémon T-shirt, handcuffs, and ankle shackles, appeared subdued as she stood before Whitten. Sources say courthouse security officers ordered the shackles after they reviewed her school disciplinary record, which included reprimands for spraying a boy with pineapple juice and sitting on her feet.

"It's not easy finding cuffs that small," said a bailiff, who spoke on the condition that his name not be used. "Fortunately, we ordered a special set last week after that other kid was busted."

That "other kid" is 13-year-old Christopher Beamon, a Ponder seventh-grader whom Whitten ordered detained October 28 after he wrote a graphic Halloween horror story in which he describes shooting a teacher and two students after getting high on Freon. After complaints from parents, Ponder High School Principal Chance Allen called juvenile authorities, who sent sheriff's deputies to remove Christopher from school. He was released after being held five days at the juvenile facility.

Denton County District Attorney Bruce Isaacks said Tuesday that he hasn't decided whether to prosecute Cindy. If convicted of making a terroristic threat, she could be confined to the Texas Youth Commission until she turns 18.

"We've considered having her certified to stand trial as an adult, but even in Texas there are some limits," Isaacks said.

Whitten told reporters that she took action at the request of school officials, who were alarmed by acts of "cannibalism, fanaticism, and disorderly conduct" that Cindy wrote about in her report, titled "*Where the Wild Things Are*: A Book Report by Cindy Bradley."

Cindy received two gold stars and a stamped smiley face for the teacher-assigned report, according to her mother, Karen Bradley.

"I thought the report was good and deserved the stickers it got," the bewildered mother says. "I thought it was a sign that we had turned a corner with Cindy's academic career. God knows what this will do to her permanent record."

Cindy's trouble began Monday morning, when the mother of one of her classmates called school officials to complain that students at Ponder were encouraged to read books that could cause students to think dangerous thoughts. The officials then contacted Dr. Byron Welch, who runs the Denton county school district, who in turn contacted juvenile authorities.

"In this day and age, you never know what students might do, and I can't risk another Columbine," Welch says. "Frankly, these kids scare the crap out of me."

Welch also confirmed reports that school representatives will soon join several local faith-based organizations, including God-Fearing Opponents of Freedom (GOOF), and ask publishers to review content guidelines for children's books.

Written by Maurice Sendak, the 1964 win-

Do they make handcuffs this small? Is afraid of this little girl.

ner of the Caldecott Medal for Most Distinguished Picture Book, *Where the Wild Things Are* is a 37-page book about a boy named "Max" who dresses in a wolf costume and is sent to his room without supper for making mischief. The most controversial aspect of the book is contained in an early exchange between Max and his mother. It reads:

*"His mother called him 'WILD THING!' and Max said 'I'LL EAT YOU UP!' so he was sent to bed without eating anything."*

Reached on the presidential campaign trail in South Carolina, Gov. George W. Bush said he had not read the book, but was "appalled that such material could find its way into the hands of a Texas schoolchild. This book clearly has deviant, violent, sexual overtones.

"Parents must understand that zero tolerance means just that," he said. "We won't tolerate anything."

In Washington, D.C., the news of Cindy's arrest prompted an immediate outcry from the American Civil Liberties Union, which has offered to provide Cindy with free legal representation.

"Jesus H. Christ, are you people nuts? She's
Continued on page 13

### Stop the madness
#### Continued from page 11

just a kid," said the ACLU's Emily Whitfield, the organization's national spokeswoman, who commented while en route to Dallas with a team of lawyers in tow. "When I was Cindy's age, we sang 'On Top of Old Smokey,' and 'Marijuana, Marijuana, LSD.'"

The schoolyard rhyme "On Top of Old Smokey" refers to shooting a teacher "with a .44-slug." The later drug ditty concludes: "Scientists make it, teachers take it. Why can't we?"

By 5 p.m. Tuesday, the day's events were beginning to take their toll on Cindy, who asked her mom to bring her pink pajamas, the ones with the kangaroos on them, before lights-out.

"I don't get why everyone's so mad," Cindy said in a phone interview from the detention center. "Just 'cause I like how Max told his mom he wanted to eat her up and ran away in his mind and did a rumpus with the monsters doesn't mean I would do those things."

Cindy scoffed at the suggestion that *Where the Wild Things Are* can corrupt young minds.

"Like, I'm sure," she said. "It's bad enough people think like Salinger and Twain are dangerous, but Sendak? Give me a break, for Christ's sake. Excuse my French." 🔲