COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-400-CV

 

 

JACK D. BROCK                                                                  APPELLANT

 

                                                   V.

 

JULIE FREDERICK TANDY                                                        APPELLEE

 

                                              ------------

 

           FROM THE 153RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                   MEMORANDUM OPINION[1] ON REHEARING

 

                                              ------------

                                          I.  Introduction








In this accelerated interlocutory appeal,[2]
Appellant Jack D. Brock complains that the trial court erred by denying his
motion for traditional and no evidence summary judgment in favor of Appellee
Julie Frederick Tandy.  While we deny
Brock=s motion
for rehearing, we withdraw our earlier opinion and judgment of May 14, 2009,
and substitute the following.  We affirm.

                          II.  Factual and Procedural Background

This defamation action arose from disputes
between Brock and the City of Keller (ACity@)
regarding Brock=s real propertyCspecifically,
a subdivision plat that Brock had originally submitted for development in 1999,
but that was signed in 2004; the condemnation of an easement by the City for
water drainage across some of Brock=s
property in 2007; and the denial, at some point before May 12, 2007, of Brock=s
application to change zoning on some of his property so he could put a RaceTrac
gas station on it.[3]  Tandy was elected mayor in 2003 and 2005; she
was not reelected in 2007.








Brock paid for the following advertisement (the AAd@), along
with a copy of the controversial plat, to run in The Keller Citizen,
a local newspaper, on May 4, 2007, eight days before the mayoral election that
Tandy lost.  The Ad stated:

This is a copy of the final plat of West Park Addition in Keller.  I originally had an approved plat in 1999
that was destroyed by a corrupt City Hall. 
I could not[4]
prove that I had received approval, and so had a new plat made in 2004.  In the signature and dedication section, you
will see my name notarized and dated June 3, 2004.  You will see that the plat is shown to have
been recorded June 18, 2004, at the county courthouse and is located in Cabinet
A, slide 9330.  In the box under the
county clerk=s name, our own mayor=s signature appears dated
June 15, 1999.  The only problem is she
wasn=t mayor in 1999!  Like me, she really signed it in June 2004,
but backdated the signatures to cover up the corruption.  More than corruption, this amounts to
fraud.  And recording a fraudulent
document is a felony.

 








In the past few months, citizens of Keller have witnessed flooding on
Whitley Road that has wrongly been blamed on me.  The blame should be directed at Mayor Tandy
and Councilman Steve Trine who refused to meet with me and were too busy to
find out what mistakes the City Manager and his staff made to cause this
mess.  Only two council members wanted to
know the truth.  The truth is the City
Manager and three members of his staff made a verbal agreement with me for an
easement in June of 2004.  But our mayor
and her friends voted in March 2007 to steal it the old-fashioned wayCeminent domain.  They decided to take my land by force now and
face the damage suit later.  The city
ruined my pasture by condemning a strip of land through the middle of my
property, turning my one piece of land into two separate parcels that are no
longer connected.  Furthermore, by
putting a drainage ditch through the middle of my property, they have ruined
what were to be 20 future residential lots. 
And the ditch they have put in doesn=t even drain, but serves as a breeding ground for
mosquitoes instead.

 

Last week I instructed my attorney to take a copy of the falsified
plat to the Tarrant County District Attorney to have the following charges
against the Mayor and staff investigated: 
1) committing fraud and recording falsified legal documents, 2)
conspiracy to deny me the use of my property, 3) violation of state and city
water laws, and 4) trespassing on private property by diverting controlled
ground water onto my property.

 

In the past, anytime the [C]ity
of Keller has needed anything, I have willingly given.  I have given my time.  I have given my money.  I have given road frontage and sewer
easements free of charge.  All the [C]ity
has ever had to do was ask.  After living
here for 80 years, it is a sad day when I have to go to the county district
attorney=s office
about the corruption in our city.

At the bottom of the Ad is the following legend, AWritten
and paid for by Jack Brock.@

Tandy sued Brock, claiming libel per se.  Brock moved for a traditional and no evidence
summary judgment.  The trial court denied
Brock=s
motion, and this appeal followed.

                                          III.  Discussion








In his first issue, Brock argues that the summary
judgment evidence conclusively shows that the factual assertions that Tandy
complains of were not defamatory and that there is no evidence that the
assertions were defamatory.  In his second
and third issues, he presents the same arguments with regard to the truth of
the assertions and whether he made them with actual malice.

A.  Standard of Review

When a party moves for summary judgment under
both rules 166a(c) and 166a(i), we will first review the trial court=s
judgment under the standards of rule 166a(i). 
Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 600 (Tex. 2004).  If the nonmovant failed to produce more than
a scintilla of evidence under that burden, then there is no need to analyze
whether the movant=s summary judgment proof
satisfied the less stringent rule 166a(c) burden.  Id.

Under rule 166a(i), the party without the burden
of proof may, without presenting evidence, move for summary judgment after an
adequate time for discovery on the ground that there is no evidence to support
an essential element of the nonmovant=s claim
or defense.  Tex. R. Civ. P.
166a(i).  The motion must specifically
state the elements for which there is no evidence.  Id.; Johnson v. Brewer & Pritchard,
P.C., 73 S.W.3d 193, 207 (Tex. 2002). 
The trial court must grant the motion unless the nonmovant produces
summary judgment evidence that raises a genuine issue of material fact.  See Tex. R. Civ. P. 166a(i) &
cmt.; Sw. Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002).








When reviewing a no evidence summary judgment, we
examine the entire record in the light most favorable to the nonmovant,
indulging every reasonable inference and resolving any doubts against the
motion.  Sudan v. Sudan, 199
S.W.3d 291, 292 (Tex. 2006).  If the
nonmovant brings forward more than a scintilla of probative evidence that
raises a genuine issue of material fact, then a no evidence summary judgment is
not proper.  Moore v. K Mart Corp.,
981 S.W.2d 266, 269 (Tex. App.CSan
Antonio 1998, pet. denied).  We review a
no evidence summary judgment for evidence that would enable reasonable and fair‑minded
jurors to differ in their conclusions.  Hamilton
v. Wilson, 249 S.W.3d 425, 426 (Tex. 2008) (citing City of Keller v.
Wilson, 168 S.W.3d 802, 822 (Tex. 2005)).

B.  Libel per se








As a public official when Brock placed the Ad,
Tandy has the burden to prove that Brock published a false statement of fact
that was defamatory concerning her while acting with actual malice regarding
the statement=s truth.  See Bentley v. Bunton, 94 S.W.3d 561,
579, 586 (Tex. 2002); WFAA‑TV, Inc. v. McLemore, 978 S.W.2d 568,
571 (Tex. 1998), cert. denied, 526 U.S. 1051 (1999).  Tandy sued Brock claiming libel per se, i.e.,
that the printed words were so obviously hurtful to her that they require no
proof of their injurious character to make them actionable.  See Clark v. Jenkins, 248 S.W.3d 418,
437 (Tex. App.CAmarillo 2008, pet. denied), petition
for cert. filed, 77 U.S.L.W. 3531 (U.S. Mar. 5, 2009) (No. 08-1122).  On appeal, Brock asserts that four key
statements in the Ad were not defamatory, were not false, and were not made
with actual malice.[5]

1. 
Defamatory Meaning

Brock argues that Tandy had no defamation claim
based on the following four statements:

(1) ALike me, she really
signed it in June 2004, but backdated the signature to cover up the
corruption.  More than corruption, this
amounts to fraud.  And recording a
fraudulent document is a felony.@ 

 

(2) AThe blame should be
directed at Mayor Tandy and councilman, Steve Trine who refused to meet with me
and were too busy to find out mistakes the City Manager and his staff made that
caused this mess.@

 

(3) ABut our mayor and her
friends voted in March 2007 to steal [the easement] the old fashioned wayCeminent domain.@ 








(4) ALast
week I instructed my attorney to take a copy of the falsified plat to the
Tarrant County District Attorney to have the following charges against the
mayor and staff investigated:  1)
committing fraud and recording falsified legal documents, 2) conspiracy to deny
me the use of my property, 3) violation of state and city water laws, and 4)
trespassing on private property by diverting controlled ground water onto my
property.@

Although Tandy made reference to these statements in her petition, she
also reminds the court that we must read the Ad in its entirety and not just
consider the individual statements in isolation.[6]








Libel is defamation expressed in written form
that tends to injure a living person=s
reputation and thereby expose her to public hatred, contempt or ridicule, or
financial injury or to impeach her honesty, integrity, virtue, or reputation.  See Tex. Civ. Prac. & Rem. Code Ann. ' 73.001
(Vernon 2005).  Whether a publication is
capable of being defamatory is initially a question of law to be determined by
the court.  New Times, Inc. v. Isaacks,
146 S.W.3d 144, 155 (Tex. 2004), cert. denied, 545 U.S. 1105 (2005); Turner
v. KTRK Television, Inc., 38 S.W.3d 103, 114 (Tex. 2000).  To make this determination, the trial court
should consider whether the words used are reasonably capable of defamatory
meaning by considering the allegedly defamatory statement as a whole.  See Musser v. Smith Prot. Servs., Inc.,
723 S.W.2d 653, 654B55 (Tex. 1987).  The determination is based on how a person of
ordinary intelligence would perceive the entire statement.  See Bentley, 94 S.W.3d at 579; Harvest
House Publishers v. Local Church, 190 S.W.3d 204, 210 (Tex. App.CHouston
[1st Dist.] 2006, pet. denied), cert. denied, 127 S. Ct. 2987
(2007).  And even if individual
statements considered in isolation are literally true or non‑defamatory,
a publication can convey a false and defamatory meaning by omitting or
juxtaposing facts.  See Turner, 38
S.W.3d at 114B15.  A publication as a whole may be defamatory if
the publication creates a false impression. 
See id. at 117B18.








Additionally, as Tandy was a public official at
the time, the statements must be of such character that, if they were true,
would have subjected her to removal from office, to criminal charges, or to
imputation of official dishonesty or corruption.  See Bentley, 94 S.W.3d at 582 (AAccusing
a public official of corruption is ordinarily defamatory per se.@); Brasher
v. Carr, 743 S.W.2d 674, 677 (Tex. App.CHouston
[14th Dist.] 1987) (AStatements that are of such a
character as, if true, would subject a public official to removal from office
or charge him with a crime are libelous per se.@), rev=d on
other grounds, 776 S.W.2d 567 (Tex. 1989).

In its entirety, a reasonable person could
interpret the Ad=s overall gist to be that a Acorrupt
City Hall@ (via its corrupt employees)
destroyed Brock=s West Park III plat some time
between 1999 and 2004, after it had been approved; that Tandy committed a
felony by backdating her signature in 2004 to cover up the corruption involved
in destroying Brock=s original plat (backdating
rendering the plat fraudulent) and by then recording the fraudulent plat; that
Tandy was also to blame for Brock flooding Whitley Road because she refused to
meet with him and was too busy to look into mistakes caused by City employees
(allowing them to run amuck); and that in March 2007, Tandy voted to steal his
land via eminent domain, ruining his pasture and his development plans, after
conspiring to deny him the use of his property, violating state and city water
laws, and trespassing on his property by diverting controlled ground water onto
it.[7]








A reasonable person could view the Ad as
appearing to impeach Tandy=s
honesty or reputation and to expose her to public hatred, contempt, or
ridicule.  See Tex. Civ. Prac.
& Rem. Code Ann. ' 73.001; Isaacks,
146 S.W.3d at 155; Turner, 38 S.W.3d at 114B15; Musser,
723 S.W.2d at 654B55.  Furthermore, the Ad tends to impute official
dishonesty and corruption to Tandy.  See
Bentley, 94 S.W.3d at 582; Brasher, 743 S.W.2d at 677.  Therefore, we conclude that the publication
as a whole, as well as at least one of its individual statements,[8]
is capable of being defamatory, and we overrule Brock=s first
issue.[9]








2.  Actual
Malice

To establish actual malice, the plaintiff must
prove that the defendant published a defamatory falsehood Awith
knowledge that it was false or with reckless disregard of whether it was false
or not.@  WFAA‑TV, 978 S.W.2d at 573 B 74
(quoting New York Times Co. v. Sullivan, 376 U.S. 254, 279B80, 84
S. Ct. 710, 726 (1964)).  Reckless
disregard is a subjective standard that requires the plaintiff to bring forth
evidence that the defendant entertained serious doubts as to the truth of the
publication at the time it was published. 
Hearst Corp. v. Skeen, 159 S.W.3d 633, 637 (Tex. 2005).  A presentation of facts that is misleading,
even negligently so, will not constitute a Acalculated
falsehood@ unless those facts are
published with knowledge or strong suspicion by the publisher that they are
misleading.  See Turner, 38 S.W.3d
at 120.








Actual malice focuses on the defendant=s state
of mind, particularly his attitude toward the truth of what he reported, which
a plaintiff can prove through objective evidence about the publication=s
circumstances and the defendant=s
conduct at the time of publication.  Id.;
WFAA‑TV, 978 S.W.2d at 573B74; see
also Bentley, 94 S.W.3d at 591, 596. 
When the defendant=s words lend themselves to more
than one interpretation, the plaintiff must establish either that the defendant
knew that the words would convey a defamatory message or that he had reckless
disregard for their effect.  Isaacks,
146 S.W.3d at 162.  Publications alleged
to be defamatory must be viewed as a wholeCincluding
accompanying statements, headlines, pictures, and the general tenor and
reputation of the source itself, and we consider the actual malice issue within
this context.  See City of Keller,
168 S.W.3d at 811 (citing Isaacks, 146 S.W.3d at 158B59, for
the proposition, with regard to a no evidence assertion, that legal sufficiency
cannot disregard parts of a publication, considering only false statements to
support a plaintiff=s verdict or only true ones to
support a defense verdict).  And, as the
Supreme Court of Texas has stated:

To disprove actual malice, a defendant may
certainly testify about his own thinking and the reasons for his actions, and
may be able to negate actual malice conclusively.  But his testimony that he believed what he
said is not conclusive, irrespective of all other evidence.  The evidence must be viewed in its
entirety.  The defendant=s state
of mind canCindeed, must usuallyCbe
proved by circumstantial evidence.  A
lack of care or an injurious motive in making a statement is not alone proof of
actual malice, but care and motive are factors to be considered.  An understandable misinterpretation of
ambiguous facts does not show actual malice, but inherently improbable
assertions and statements made on information that is obviously dubious may
show actual malice.  A failure to
investigate fully is not evidence of actual malice; a purposeful avoidance of
the truth is.  Imagining that something
may be true is not the same as belief.








Bentley, 94 S.W.3d at 596 (internal citations omitted). 

a. 
Brock=s Testimony

Tandy attached Brock=s
deposition to her response to his motion for summary judgment.  Brock testified that he did not need to
research the facts in the Ad because they were known to him personally,[10]
and he gave the following explanation:

Q. Okay.  Did you intend the readers of The Keller
Citizen to understand the meaning of this [A]d, that it was about corruption,
that it was about fraud?

 

A. Yes, because every week in The Keller
Citizen[,] the City Manager had theChad the
Assistant City Manager . . . go down there and tell them that the only reason
that the water was being flooded on Whitley Road by me was because of some
RaceTrac gasoline [station] that was rejected,[11]
and the final blow on this is when they sat up here andCwith
Julie Tandy as mayor and signature of the City of Keller to sit up here and
took a vote to condemn my property when they are illegally putting water on me.

He testified that he had never met Tandy prior to his deposition, and
that with regard to the Ad, A[t]his
was not a personal attack on Julie Tandy as a person, only as the signature for
the City of Keller.@ 
He also testified that the mayoral election date had nothing to do with
the date that he ran the Ad.








Brock admitted that he assumed that Tandy knew
about the backdating because she was the mayor.[12]  He did not try to find out who had done the
backdating.  He testified that he assumed
that the City had destroyed the 1999 plat because they had no record of it when
he asked for it.[13]  He admitted that he did not research whether
recording a fraudulent document is a felony, and he stated, AI just
know that it=s fraudulent, and you go down
there and record aCa document that=s
fraudulent is a felony.@ 
He also stated that he would call that action a felony whether it was or
was not, and that, with regard to his Ad, Aas far
as [he was] concerned, it is all fact,@ and
that he did not imagine it.

Brock gave the following testimony about whether
Tandy refused to meet with him:








Q. Isn=t it true that they
offered to meet with you?

 

A. Only if I would take
and give them an easement.

 

Q. And you refused?

 

A. I have a letter from
the City Attorney, stating the only way that they would meet with me is if I
went ahead and gave them an easement to take illegal water across my property
and trespass on me.[14]

 

Q. So when you say they
refused to meet with you, that isn=t true, is it?

 

A. They wouldn=t meet with me unless the
stipulations went with it.

 

Q. So they would meet
with you. . . . if you met the stipulation.

 

A. I can=t meet
those stipulations.[15]








With regard to the vote to condemn his property,
Brock explained that Aand her friends@
referred to the City Council, but he acknowledged that Tandy, as mayor, did not
cast a vote on the decision to condemn the easement.  He faulted Tandy for not behaving the way he
had when he was mayor.[16]

With regard to his statement about instructing
his attorney to take the plat to the Tarrant County district attorney, Brock
gave the following testimony:

Q. . . . When you put
that in the ad, did you intend for people reading it to understand that Julie
Tandy had committed fraud and recorded falsified legal documents?

 

A. The City of Keller and
staff. . . . The mayor and staff investigated. . . . I wanted to understand
that I was going to have it investigated by the DA.

 

. . .
.

 

Q. And didn=t you want them to
believe it was true?

 

A. That would be up to the individual . . . how
they take it.  If you=re being
investigated[, that] doesn=t mean
that you=re
guilty of anything. . . . I wanted them to believe that I was mad about this,
about getting my property flooded. . . . I wanted the readers to believe it
that it was going to be investigated to see if it was true.

. . . .








Q. What was your intent
when you attributed these four criminal acts, committing fraud and recording
falsified legal documents, conspiracy to deny me the use of my property,
violation of state and city water laws, trespass on private property by
diverting controlled water onto my property, you attribute those four acts that
you say you want investigated to Mayor Tandy. 
Did you intend for the readers to believe that she had committed those
acts?

 

A. Not that she committed
it.

 

Q. What did you intend
for them to believe?

 

A. That the City was
committing fraud, recording falsified documents.  I know she didn=t go down there and
record it.  Conspiracy to deny me the use of my property.

 

Q. Did sheCdid she do that?

 

A. She didn=tCno, she didn=t do that, but the City did. . . .
And violate state and city water laws. 
It=s on the books.

 

Q. So you have now gone
through those four items and said Julie Tandy didn=t do any of those things,
correct?

 

A. No, I said the City
did. . . . And she is theCpart of the City.

 

Q. So when you say you
want to have the following charges against the mayor and staff investigated . .
. . is it your testimony that the mayor committed those acts?

 

A. I want the mayor and
the staff investigated to see which one of those acts she=s guilty of and the City
staff, and by Aher@ I mean the City.

 

Q. And did you intend for
the reader to believe that she had committed them?

 

A. No.

 








Q. Well, earlier in the
ad and earlier in your testimony today you stated that she did commit fraud by
recording a fraudulent document.

 

A. Mm-hmm. . . . I said
that when you take and record something like this, it=s fraud.

 

Q. So it=s your testimony that
Julie Tandy did commit fraud?

 

A. The mayor committed
fraud.

 

Q. Mayor Julie Tandy?

 

A. Yes. 
[Emphasis added.]

Brock testified that he had not thought about or
looked into whether accusing Tandy of a felony related to her fitness for
office or whether she could be removed from office, but that he did not intend
to impeach her reputation or injure her in her office, although he acknowledged
that injury to her reputation Acould be
one effect of it.@ 
He also testified that he did not bother to investigate whether Tandy
knew that her signature was backdated, because A[a]s far
as [he] was concerned, it was done by the City.@








Brock testified that he had known James Carson, a
Keller City Council member, for six to eight months, that Carson had visited
his home, and that he spoke with Carson on the phone probably three to four
times, although he did not keep track.[17]  He denied remembering any conversations with
Carson discussing methods to unseat Tandy as mayor.  He acknowledged receiving a copy of the May
4, 2007 memo from the City Manager to the mayor and City Council about the Ad
from Carson.[18]

b. 
Carson=s Testimony








Tandy attached Carson=s
deposition to her response to Brock=s motion
for summary judgment.[19]  Carson testified that while he was on the
Keller City Council, he had conversations with Brock about the plat and asked
Otis Welch, one of the other signatories, about the backdating.  He learned from Welch (who learned from someone
at Town Hall) that it was customary Ato date
the plat whenever it was actually approved by the Planning & Zoning and
whenever it was approved by the City Council,@ and
that was all the investigation he or Welch did.

Carson testified that he received a copy of the
Ad from Brock=s son before it was published,
and he gave the following testimony about Brock and the Ad:

Q. . . . So early 2007, [Brock]
tells you he intends to publish the plat. 
What is your response to that?

 

A. AWhy?@  MyCI gave him my interpretation of the plat, which
was that, AYes, [Brock], it could be
what you say it is.  But it=s also very likely that
it=s a simple mistake.@ . . . And his reply back
to that was, AIt can=t be.@

 

Q. Okay.  So his interpretation is what?  When he comes to tell you about it in early >07, what does he say his
interpretation of the plat is?

 

A. He has repeatedly made
the charge that this plat represents fraud, deliberate fraud.

 

Q. And your response is?

 

A. AYou can=t prove
it, [Brock].@ . . . What my thought was, was
that the explanation that this is customary is just wrong, and whoever wrote
the dates in was operating under the erroneous assumption that it is customary
to backdate.  That=sCthat was
what I considered the most likely explanation . . . of this plat.








Carson estimated that he had this conversation with Brock two or three
times, and he testified that Brock could not fathom that it could be just a
simple mistake and that Brock was adamant that it was not.  He testified that he encouraged Brock not to
run the Ad, that he never asked Tandy whether she knew her signature had been
backdated, and that, to his knowledge, Brock never asked her either.  Carson also testified that, to his knowledge,
there was never any conspiracy to deny Brock the use of his property, and that
he thought Brock ran the Ad to expose what Brock considered fraud and to cause
Tandy to lose votes in the mayoral election, based on the timing of the
publication and his conversations with Brock. 
Carson testified that although he voted to use eminent domain to take
the easement on Brock=s land, he regretted that vote.

Carson also admitted drafting the following
language of a response to Tandy=s open
records request:

Though not required by
any law, you may also inform Ms. Tandy that communications by and between Jim
Carson and Jack Brock or any of his business associates can be generally
classified as either 1) Jim Carson listening to Jack Brock=s telling or retelling of
the real or perceived wrongs perpetrated by the City of KellerCparticularly City Manager
Lyle DresherCagainst Jack Brock, his
family, and/or his property, or 2) Jim Carson and Jack Brock discussing (but
not always agreeing on) methods to unseat Mayor Julie Tandy and others.

 

[Emphasis added.] He testified that his conversations with Brock about
unseating Tandy were different from their conversations about the Ad.  Carson is the publisher and primary editor of
a web log (Ablog@) named AKeller
City Limits.@ 
He posted the draft response on his blog.

 








c. 
Analysis

Less than a scintilla of evidence exists when the
evidence is so weak that it does nothing more than create a mere surmise or
suspicion of a fact.  Kindred v.
Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).  More than a scintilla of evidence exists when
the evidence would enable reasonable and fair-minded people to reach different
conclusions.  Ford Motor Co., 135
S.W.3d at 601; Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 711
(Tex. 1997).  A genuine issue of material
fact is raised by presenting evidence on which a reasonable jury could return a
verdict in the nonmovant=s favor.  Moore, 981 S.W.2d at 269.

Although Brock stated in his affidavit that he
believed the contents of the Ad at the time that he published it, Tandy
presented evidence from Brock=s
deposition that he knew at least two of his statements were false (i.e., that
Tandy did not actually vote on the decision to condemn the easement and that
Tandy did not record the allegedly fraudulent plat); that at least one of his
statements was not entirely true (i.e., that Tandy offered to meet with him,
but with conditions he found unacceptable); and that he acted with reckless
disregard as to the effect of his words. 
See Isaacks, 146 S.W.3d at 162; WFAA-TV, 978 S.W.2d at
571.








Furthermore, Tandy presented evidence that Brock
acted with a lack of care with regard to the truth or falsity of his statements
in that he did no research on whether Tandy backdated the plat (although he was
willing to give the benefit of the doubt to one of the other signatories) and
whether recording a fraudulent document was actually a felony; that Brock had a
motive to have Tandy replaced as mayor; and that Brock refused to consider any
other possibility besides fraud, even when presented with that possibility by
Carson.  See Bentley, 94 S.W.3d at
591, 596.  Therefore, we conclude that
the trial court did not err by denying Brock=s motion
for summary judgment because Tandy presented more than a scintilla of evidence
of actual malice, and we overrule Brock=s third
issue.

                                          IV.
Conclusion

Having overruled Brock=s
dispositive issues, we affirm the trial court=s order,
and we order Brock to pay Tandy=s court
costs and reasonable attorney=s fees
incurred in this appeal, to be determined by the trial court.  See Tex. Civ. Prac. & Rem. Code
Ann. ' 51.015
(Vernon 2008).  We grant in part and deny
in part Brock=s motion for judicial notice,
and we deny his supplemental motion for judicial notice.

 

BOB
MCCOY

JUSTICE

 

PANEL: CAYCE, C.J.; MCCOY
and MEIER, JJ.

 

DELIVERED: July 2, 2009











[1]See Tex. R. App. P. 47.4.





[2]See Tex. Civ. Prac. &
Rem. Code Ann. ' 51.014(a)(6)
(Vernon 2008).





[3]In 1991, Brock began the
process of developing some of his property into a residential subdivision.  In 1992, the City approved the plat for the
first phase, West Park I, and the installation of water and sewer for all
phases of the West Park Subdivision development.  The City subsequently approved West Park II=s plat.  At some point between 1992 and 1999, the
events leading to the dispute over the water drainage easement began.  In 1999, the City approved West Park III=s plat.

In 2001,
Brock discovered that his plat for West Park III was unsigned.  Brock also began damming the inlet into his
drainage ditch to prevent the City from using it.  The City eventually filed a condemnation
action to acquire a drainage easement.  A
unanimous City Council voted to condemn the easement on Brock=s property.





[4]Brock testified that The
Keller Citizen printed his article with a typographical error, and that
it should have read, AI could prove that I had
received approval, and so had a new plat made in 2004.@





[5]Summary judgment cannot
be granted except on the grounds expressly presented in the motion.  Johnson, 73 S.W.3d at 204; Sci.
Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 912 (Tex. 1997).  Brock asks us to reverse the trial court=s judgment denying his
motion for summary judgment and to render judgment on his behalf.  However, although Brock argues in his second
issue that A[t]he summary judgment
evidence conclusively demonstrates that the factual assertions complained of by
[Tandy] were true or that there is no evidence that they were false,@ he did not raise this as
a ground for summary judgment in his motion. 
Therefore, we may not address this issue for the first time on
appeal.  See Johnson, 73
S.W.3d at 204; Martinez, 941 S.W.2d at 912.





[6]Although Brock complains
that Tandy did not plead a complaint to interpret the Ad and that she cannot
now complain about imputed assertions of fraud and corruption, Tandy=s petition is very broad,
pleading defamation with reference to both specific statements and the Ad in
general, stating, ADefendant intentionally
published a written communication stating verifiable facts and accusations
relating to Tandy in her official capacity as Mayor . . . .  The Ad was unambiguous and the statements
therein were false and made with actual malice and with knowledge of and
reckless disregard for their falsity.@  She
attached a copy of the Ad to her petition, along with Brock=s deposition.





[7]Tandy testified that she
was not aware of any controversies between the City and Brock regarding the Phase
III plat prior to May 4, 2007.  She
stated in her affidavit that she did not fill in the date after her signature
when she signed the plat in 2004.  She
also testified that she did not vote on the council=s decision to condemn
Brock=s property and that the
council vote was unanimous.  Tandy
testified that her reputation in the community had been damaged by the Ad,
based on feedback and comments that she received, and that she had never met
Brock before his deposition.





[8]Specifically, statement
(1), which accuses Tandy of official dishonesty, could appear to a reasonable
person to be defamatory.





[9]Brock has requested by
motion that we take judicial notice of the copies of the City=s charter and article 4
of the City=s Unified Development
Code, and by supplemental motion that we take judicial notice of the copies of
article 4 of the City=s Unified Development
Code and section 16-204 of the City=s Subdivision Ordinance Number 571, dated March
29, 1989, that he supplied to the court. 
We grant his original motion in part, as to the charter, because he
presented this same request to the trial court. 
We deny the remainder of his original motion.

Even if we
were to grant his motion and supplemental motion as to article 4, which he did
not present to the trial court, in light of our resolution above with regard to
the imputation of official dishonesty, we need not also address his argument
that, although Tandy allegedly violated article 4, she failed to show that
backdating was a basis to remove her from her office as mayor.  See Tex. R. App. P. 47.1; see also
Tex. Penal Code Ann. ' 37.10(a)(1)B(3), (c)(1) (Vernon Supp.
2008) (defining tampering with governmental records as a state jail felony when
committed with intent to defraud), and Keller, Tex., Charter art. III, ' 3.02 (2008)
(stating that A[a] member of the council
. . . who is convicted of a felony while in office shall immediately forfeit
his office@).  And although his supplemental motion purports
to submit section 16-204 of the City=s Subdivision Ordinance, the section actually
submitted and certified is 16-240. 
We deny his supplemental motion in its entirety.





[10]Brock also stated in his
affidavit attached to his motion for summary judgment that at the time he
published the Ad, he Abelieved its contents.@





[11]Brock reapplied for a
zoning change for the RaceTrac gas station after Tandy lost the mayoral
election and one of the council members had been replaced.





[12]Brock testified that Otis
Welch, the chairman of the planning and zoning commission who also signed the
plat in 2004, did not commit a felony Abecause, actually, he probably didn=t know@ that his signature was
going to be backdated.





[13]Brock claimed that the
City destroyed his Phase III plat, having Aheard from one of the City employees that some
lady went down there where the plats and everything was kept with a garbage can
and threw every plat in it in the garbage,@ but he did not remember who the City employee
was or who the Alady@ was who allegedly threw
the plats away.

Brock also
testified that he did not recall receiving a letter from the City in September
1999, after the approval of his final Phase III plat, requesting that he submit
required information for filing with Tarrant County, but he later testified
that he hand-carried all of the requirements within the thirty-day time limit
set out in the letter.  He also did not
recall receiving a second notice requesting the same information in February
2000.





[14]The December 22, 2006
letter from the City Attorney to Brock=s attorney stated, in pertinent part:

 

As you are aware, the [City] has initiated proceedings to acquire a
drainage easement across [Brock=s] property. 
In a good faith attempt to discuss and possibly resolve the issues
relating to this acquisition, I have been instructed to convey to you that the
Mayor and two City Council members would be willing to meet personally with your
client at Town Hall at a mutually convenient time.  As a prerequisite to the meeting, your
client, as a show of good faith, must remove the existing Adam@ and other fill or materials
so as to allow full flow of water across the current drainage ditch.





[15]In his affidavit, Brock
stated, AI was unwilling to have
the meeting under these conditions.@





[16]Brock testified, A[W]hen I was mayor, if
anything was wrong, I wouldn=t let it happen.@  He stated in his affidavit that he held Amulti terms as the [City=s] mayor.@





[17]Carson was on the Keller
City Council during the last year of Tandy=s second term.





[18]In the memo, the city
manager states that the planning and zoning commission secretary (a city staff
member) dated all of the City official signatures with the actual date of
approval of the plat because he thought that both the signature date of the
plat and the resolution date approving the plat in 1999 should be the
same.  He also states that the backdating
did not void the plat because all signatures and other essential documentation
were in order when filed in 2004, although the city staff member should not
have backdated the signatures.  Carson
testified that the city manager=s explanation in response to the Ad was Athe most likely truthful
explanation.@  Carson testified that he did not recall
giving Brock a copy of the memo.





[19]Carson was deposed
because of his role as a member of the City Council and because of his relationship
with Brock.